[Cite as *Siegel v. Univ. of Cincinnati College of Medicine*, 2015-Ohio-441.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Frances B. Siegel, Individually and as Administratrix of the Estate of Jessica Ann Siegel et al., | : | |
| | : | |
| Plaintiffs-Appellants, | : | No. 14AP-279 (Ct. of Cl. No. 2009-09531) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| State of Ohio, d/b/a University of Cincinnati College of Medicine et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on February 6, 2015

*John H. Metz*, for appellants.

*Michael DeWine*, Attorney General, and *Brian M. Kneafsey, Jr.*, for appellee University of Cincinnati College of Medicine.

APPEAL from the Court of Claims of Ohio

BRUNNER, J.

{¶ 1}   Plaintiffs-appellants, Frances B. Siegel, individually and as administratrix of the estate of Jessica Ann Siegel, and Daniel Siegel, appeal the judgment of the Court of Claims of Ohio, following an evidentiary hearing finding defendant-appellee Dr. Andrew Ringer, a neurosurgeon and professor at the University of Cincinnati College of Medicine, was a state employee entitled to civil immunity, pursuant to R.C. 2743.02(F) and 9.86, and that the courts of common pleas do not have jurisdiction over any civil actions that may be filed against him based on the allegations in this case.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   Jessica, the minor decedent, had a congenital malformation in the arteries of her brain, a condition known as arteriovenous malformation ("AVM").  She had been

treated for hemorrhaging because of her condition at Cincinnati Children's Hospital. However, this procedure, known as coil embolization, was unsuccessful. Hemorrhaging occurs with AVM when high-pressure arterial blood flow directly enters the low-pressure vein system and causes the veins to rupture. Jessica had been referred for further treatment to Dr. Ringer, who performed a liquid "Onyx" glue embolization on July 19, 2006 at Good Samaritan Hospital. Dr. Ringer achieved only a partial occlusion or repair, and noted an asymptomatic AVM pedicle branch perforation as a complication. He performed a second, staged embolization on August 14, 2006, and reported as complications a right frontal AVM branch extravasation prior to embolization, and a right anterior parietal middle cerebral artery branch glue embolus without occlusion. His follow-up communications to referring physicians contained contradictory statements that the July 19 and August 14, 2006 procedures were uncomplicated; Dr. Ringer explained at the hearing that the July 19, 2006 event was asymptomatic, and the August 14, 2006 communication simply went out early, the very day of the procedure.

{¶ 3} Following the August 14, 2006 procedure, a hematoma developed, and Jessica's brain began to swell with increased intracranial pressure. On August 19, 2006, Dr. Ringer performed an emergency decompressive craniectomy to relieve the pressure. Following a planned tracheostomy on August 23, 2006, Jessica's body temperature rose to 108 degrees. She suffered blood pressure and cardiac collapse. Dr. Ringer believed her condition had stabilized, but her heart stopped and she died later the same day.

{¶ 4} At the hearing, Dr. Ringer testified that he did not know specifically why Jessica had developed the extremely high fever and died. After the time during which Jessica's family could be with their daughter's body post mortem, Dr. Ringer expressed his concerns over her sudden death and the potential causes to her father, Daniel Siegel. Dr. Ringer expressed that a pulmonary embolus was a potential though unlikely cause. Also, malignant hyperthermia, due to a congenital condition, may have developed as a reaction to anesthesia, and this would be medically important knowledge for other members of her family. Dr. Ringer suggested an autopsy and ordered an examination limited to the thorax and abdomen, to look for evidence of a pulmonary embolus and cardiac problems, as well as a muscle biopsy to test for malignant hyperthermia. Plaintiffs contend that Dr. Ringer's limitation of the autopsy to the thorax and abdomen, excluding

the brain, was fraudulent and, as a result, deprived him of the statutory immunity he would enjoy as an employee of a public institution. Dr. Daniel Beckman conducted the autopsy on August 24, 2006, and ruled out a pulmonary embolus and cardiac problems, but genetic testing for malignant hyperthermia was not conclusive.

{¶ 5} In addition to the present action, plaintiffs sued Dr. Ringer and others in the Hamilton County Court of Common Pleas. After case No. 0900450 was dismissed for lack of an affidavit of merit, plaintiffs filed suit again in that same court, case No. 0907503, and that case was stayed pending the Court of Claims' determination on Dr. Ringer's entitlement to immunity. On April 2, 2013, Judge Patrick McGrath appointed Anderson Renick as magistrate to govern further proceedings. On the day of the hearing, May 15, 2013, Magistrate Holly True Shaver was assigned to hear the case and recommended immunity in favor of Dr. Ringer in her report. Plaintiffs objected to the magistrate's decision, and Judge McGrath adopted it, rendering judgment in favor of Dr. Ringer.

## II. ASSIGNMENTS OF ERROR

{¶ 6} Plaintiffs now appeal assigning the following ten assignments of error:

[I.] The trial court erred to the prejudice of appellants by entering judgment on findings of a magistrate who did not have jurisdiction to conduct the immunity hearing.

[II.] The trial court erred to the prejudice of appellants by affirming a referral of the case to a magistrate for factual and credibility findings since to do so denies due process.

[III.] The trial court erred to the prejudice of the appellants in refusing to admit affidavit.

[IV.] The trial court erred by exceeding its jurisdiction by not severing or limiting the claim for fraud from the issue of immunity.

[V.] The trial court erred to the prejudice of the appellants in unreasonably restricting discovery contrary to Ohio Supreme Court precedent.

[VI.] The trial court erred to the prejudice of appellants in overruling plaintiffs' objections to the magistrate's findings and in adopting the magistrate's findings and ruling against

the manifest weight of competent evidence that Ringer is entitled to immunity.

[VII.] The trial court erred to the prejudice of appellants by refusing to grant a jury trial for the factual issues.

[VIII.] The scheme evolved from R.C. 2743 and *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208 have worked an unconstitutional deprivation of the fundamental rights of Ohioans.

[IX.] ORC 2743 and 9.96 [sic] are unconstitutional and violates the separation of powers of the government.

[X.] The trial court erred by granting immunity to an individual who acted under false pretenses.

We first address and reject the procedural, jurisdictional, and constitutional arguments appellants have infused among assignments of error one, two, four, seven, eight, and nine.

## A. Reference to Magistrate and Jurisdiction in Court of Claims

{¶ 7} In their first assignment of error, appellants take issue with the timing of the Court of Claims' June 21, 2013 docket entry reflecting the appointment of Magistrate Shaver to conduct the May 15, 2013 immunity hearing. They do not demonstrate or even explain how, in particular, the retrospective nature of the docket entry, or as they argue in the second assignment of error, the referral to any magistrate in this or any case involving fact-finding and credibility determinations, deprived them of due process under the Fifth and Fourteenth Amendments to the United States Constitution and Ohio Constitution, Article I, Section 16.

{¶ 8} Appellants raised no objection to the Court of Claims' appointment of a magistrate as ordered, "without limitation of authority specified in Civ.R. 53(C)." (R. 72.) They did not object to the Court of Claims' transfer of the immunity hearing to Magistrate Shaver on the date of the hearing, as they do now on appeal. Their failure to challenge the constitutionality of the reference to a magistrate in any respect under Civ.R. 53 operates as a waiver of the issue on appeal.

> "[T]he question of the constitutionality of a statute must generally be raised at the first opportunity." *State v. 1981 Dodge Ram Van* (1988), 36 Ohio St.3d 168, 170, 522 N.E.2d 524. "Failure to raise at the trial court level the issue of the

constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *State v. Awan* (1986), 22 Ohio St.3d 120, 489 N.E.2d 277, syllabus. See, also, App.R. 12(A)(2) (providing that an appellate court may disregard an assignment of error if the party raising it "fails to argue the assignment separately in the brief, as required under App.R. 16(A)"). But, see, *In re M.D.* (1988), 38 Ohio St.3d 149, 527 N.E.2d 286, syllabus (holding that the waiver doctrine in *Awan* is discretionary and that "[e]ven where waiver is clear, this court reserves the right to consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it").

*Haver v. Accountancy Bd. of Ohio,* 10th Dist. No. 05AP-280, 2006-Ohio-1162, ¶ 22. *See Remley v. Cincinnati Metro. Hous. Auth.*, 99 Ohio App.3d 573, 576 (1st Dist.1994) (Bettman, J., concurring) (separately with opinion questioning whether Supreme Court's discretion to review constitutional challenge not raised below applies to civil as well as criminal cases and extends to courts of appeals).

{¶ 9} Appellants' constitutional arguments provide no grounds to depart from the waiver doctrine. The late docket entry has no connection to their rights to notice and opportunity to be heard. Appellants were present at the hearing and had their opportunity to be heard and present evidence. There is nothing in the record to suggest irregularity surrounding the order of reference or other, related proceedings, or the validity of the judgment in the Court of Claims. *See Eleton v. Conrad,* 12th Dist. No. CA83-02-018 (Jan. 30, 1984) (if record entries are "not an accurate reflection of the events that transpired, it is appellant's responsibility to present a record that demonstrates the alleged error, and without such a record, we must presume the regularity of the trial court's proceedings"). The appointment and hearing on May 15, 2013 were procedurally proper. We find that the trial court did not violate appellants' due process rights. *See id.* Appellants unquestionably had " 'a reasonable opportunity to be heard after a reasonable notice of such hearing.' " *Ohio Valley Radiology Assoc., Inc. v. Ohio Valley Hosp. Assn.*, 28 Ohio St.3d 118, 125 (1986), quoting *State ex rel. Allstate Ins. Co. v. Bowen*, 130 Ohio St. 347 (1936), paragraph five of the syllabus. Appellants present no substantial argument that they were deprived of the requisite notice and

opportunity for hearing appropriate to the nature of the case. *Cleveland Bd. of Edn. v. Loudermill,* 470 U.S. 532, 542 (1985).

{¶ 10} Though the April 2, 2013 order of reference was specifically to Magistrate Renick, appellants made no objection to the substitution of Magistrate Shaver on the date of the hearing. Where a matter proceeds without an order of reference to a particular magistrate, we agree with the opinion in *Hines v. Amole,* 4 Ohio App.3d 263 (2d Dist.1982), and decisions following it to the effect that lack of an order of reference alone is not jurisdictional and not prejudicial error in itself.

> Although the trial court may commit error by not fully complying with the procedural requirements of Civ.R. 53, that failure does not affect the jurisdiction of the trial court to hear and determine the action. *Eisenberg v. Peyton* (1978), 56 Ohio App.2d 144, 38 N.E.2d 1136. That a failure to comply with Civ.R. 53 is not jurisdictional in nature is supported by the decision in *Lindsay v. Lindsay* (1957), 106 Ohio App. 146, 146 N.E.2d 151, in which the court held that the question of reference is not a jurisdictional matter, but one of procedure. *Id.* at 152, 146 N.E.2d 151. Appellants do not contend that the matter *sub judice* was one in which they were entitled to a jury trial. Their objection is there was no journal entry of reference. It is only in instances in which the trial court lacks jurisdiction that a judgment is void rather than voidable. Reversible error can only be attained by prejudice that affects the substantial rights of the complaining party. *Elser v. Parke* (1943), 142 Ohio St. 261, 51 N.E.2d 711. The mere failure to properly journalize a referral to a referee does not produce prejudice *per se.*

*Id.* at 265 (no objection to trial before magistrate until untimely filing of objections and no finding of prejudicial error). *See Schialdone v. Schialdone,* 11th Dist. No. 93-T-5007 (Apr. 21, 1995) ("appellant failed to raise an objection in trial court to this procedural anomaly"); *Gem Sav. Assn. v. Edwards,* 2d Dist. No. 10411 (Oct. 6, 1987) (no timely objection and no prejudice from order of reference entered nunc pro tunc 14 days after hearing); *Schwalm v. Schwalm,* 8th Dist. No. 51490 (Mar. 12, 1987) (delay in docketing reference to magistrate held insufficient to warrant new trial; appellant demonstrated no prejudice from delay). A timely objection was not made to Shaver's service as magistrate. She was empowered only to make a recommendation. The Court of Claims issued a detailed decision on the objections to the magistrate's report. No substantial rights of the

appellants were denied by the nunc pro tunc order or lack of a formal reference to Magistrate Shaver in advance of the hearing.  *Gem Sav.*

{¶ 11} Pursuant to Civ.R. 53, as long as the reference permits it, a magistrate is authorized to determine any motion, in any case, and to conduct the trial of any case that will not be tried to a jury.  *See* Civ.R. 53(C)(1)(a) and (b).  Appellants' notion that jurisdiction transferred from the court to the magistrate with the reference is inapposite.

> Even if a trial court refers a matter to a magistrate, it retains the ability to employ its own judgment in the case, according to Civ.R. 53(D)(4)(b). The trial court judge retains jurisdiction and may exercise its own decision-making power in several ways. If objections are filed, the court must rule on those objections. It may then offer its own analysis on the same subjects. *O'Bryan v. K & H Co. Lakeshore Apts.*, 181 Ohio App.3d 741, 2009-Ohio-1417, 910 N.E.2d 1071, at ¶ 30; see also *Schultz v. Wurdlow*, 10th Dist. No. 09 AP 301, 2010-Ohio-1140, 2010 WL 1060648, at ¶ 12. If no objections are filed or if the filed objections do not raise a particular issue, the trial court can simply proceed with its own analysis. Id.

*Donofrio v. Whitman,* 191 Ohio App.3d 727, 2010-Ohio-6406, ¶ 21 (7th Dist.).

{¶ 12} "A magistrate is an arm of the court, not a separate judicial entity with independent judicial authority and duties." *State ex rel. DeWine v. Ashworth*, 4th Dist. No. 11CA16, 2012-Ohio-5632, ¶ 38.  The Court of Claims still must "undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law."  Civ.R. 53(D)(4)(d).  The court retains the ultimate authority and responsibility over the magistrate's findings and rulings.  *Hartt v. Munobe*, 67 Ohio St.3d 3, 5-6 (1993).  Appellants' suggestion that a magistrate, whether by individual capacity of the magistrate or by authorization from the court, is incapable of deciding the facts and weighing the credibility of witnesses, lacks merit.  In any event, "the court remains the ultimate finder of fact, even on matters of credibility." *DeWine* at ¶ 37.  "Although the trial court may appropriately give weight to the magistrate's assessment of witness credibility in view of the magistrate's firsthand exposure to the evidence, the trial court must still independently assess the evidence and reach its own conclusions." *Sweeney v. Sweeney*, 10th Dist. No. 06AP-251, 2006-Ohio-6988, ¶ 15, citing *DeSantis v. Soller*, 70 Ohio App.3d 226, 233 (10th Dist.1990).  We, therefore, overrule appellants' first and second

assignments of error challenging on constitutional and jurisdictional grounds the hearing before Magistrate Shaver.

{¶ 13} In their fourth assignment of error, appellants assert that the Court of Claims should have severed the malpractice claim or limited its finding of immunity to the malpractice claim. They appear to argue that their claims that Dr. Ringer had engaged in fraud, spoliation or other actionable conduct in "changing the medical records to obstruct evidence" are not subject to immunity. (Appellant's Brief, 21.) Regardless of the legal theories under which appellants seek to establish actionable liability for the alleged conduct, it was incumbent on them to first establish that the immunity afforded under R.C. 9.86 did not apply to Dr. Ringer. *Botkin v. Univ. of Cincinnati College of Medicine,* 10th Dist. No. 04AP-228, 2005-Ohio-1122, ¶ 37; *Fisher v. Univ. of Cincinnati Med. Ctr.,* 10th Dist. No. 98AP-142 (Aug. 25, 1998). Moreover, appellants were required to bring this challenge in the Court of Claims.

{¶ 14} R.C. 2743.02(F) requires that all challenges to state officer or employee immunity must be determined in the Court of Claims:

> A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the Court of Claims that has *exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.*

(Emphasis added.) In spite of appellants' dissatisfaction with the statutory scheme, their dual assertions of error by the Court of Claims concerning alleged fraud and spoliation by Dr. Ringer are inconsistent. On the one hand, appellants claim it was error below not to sever from the immunity hearing their allegations of fraud and spoliation (relating to the limited autopsy ordered by Dr. Ringer). On the other hand, appellants wish to use those very same issues, taken alone, to defeat immunity and proceed directly against Dr. Ringer on their malpractice claims as well, in the court of common pleas. However appellants may couch their substantive liability claims against Dr. Ringer, immunity for any or all of

those claims must be considered under R.C. 9.86. Only if the Court of Claims were to determine that Dr. Ringer's actions were manifestly outside the scope of his employment, or that he acted with malicious purpose, in bad faith, or in a wanton or reckless manner, would there be no immunity for his actions. It is only at this point that appellants could pursue their causes of action in the court of common pleas. *Long v. Bowling Green State Univ.*, 10th Dist. No. 96API12-1736 (June 30, 1997).

{¶ 15} R.C. 2743.02(F) vests exclusive original jurisdiction in the Court of Claims to determine whether the defendant is immune from suit. *Theobald v. Univ. of Cincinnati,* 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 13; *Johns v. Univ. of Cincinnati Med. Assoc., Inc.,* 101 Ohio St.3d 234, 2004-Ohio-824, ¶ 26-30; *Conley v. Shearer*, 64 Ohio St.3d 284, 287 (1992). The court of common pleas is prohibited "from exercising jurisdiction over the merits of the case until the Court of Claims has decided whether he [in this case, Dr. Ringer] is entitled to personal immunity under R.C. 9.86 and whether the common pleas court has jurisdiction over the malpractice action." *State ex rel. Sanquily v. Court of Common Pleas of Lucas Cty.*, 60 Ohio St.3d 78, 80-81 (1991). Appellants' fourth assignment of error contravenes the clear mandate of R.C. 2743.02(F) for exclusive, original jurisdiction in the Court of Claims for the initial determination of immunity, and is overruled.

{¶ 16} In assignments of error seven, eight, and nine, appellants restate generic arguments against the unavailability of a jury trial in the Court of Claims, which the Supreme Court of Ohio rejected in *Conley*:

> The question of whether [the defendant] is entitled to immunity as a governmental employee is a question of law for which there is no right to trial. A jury trial is necessary only when the case requires resolution of *factual* issues which are triable to a jury in comparable civil actions. See *Erie Ins. Group v. Fisher* (1984), 15 Ohio St.3d 380, 381-382, 15 OBR 497, 498-499, 474 N.E.2d 320, 322. See, also, R.C. 2311.04 and Civ.R. 56(C). "Whether immunity may be invoked is a purely legal issue, properly determined by the court prior to trial, *Donta v. Hooper* (C.A.6, 1985), 774 F.2d 716, 719, certiorari denied (1987), 483 U.S. 1019 [107 S.Ct. 3261, 97 L.Ed.2d 760], and preferably on a motion for summary judgment." *Roe v. Hamilton Cty. Dept. of Human Serv.* (1988), 53 Ohio App.3d 120, 126, 560 N.E.2d 238, 243.

(Emphasis sic.)  *Id.* at 292.  This court has observed that "the question as to whether a physician acted outside the scope of his or her employment is a question of fact." *Botkin* at ¶ 17, citing *Barkan v. The Ohio State Univ.,* 10th Dist. No. 02AP-436, 2003-Ohio-985, ¶ 11.  *See also Johnson v. Univ. of Cincinnati,* 10th Dist. No. 04AP-926, 2005-Ohio-2203, ¶ 12; *Smith v. Univ. of Cincinnati,* 10th Dist. No. 01AP-404 (Nov. 29, 2001); *Lynd v. Univ. of Cincinnati,* 10th Dist. No. 99AP-37 (Nov. 23, 1999); *Lowry v. Ohio State Hwy. Patrol,* 10th Dist. No. 96API07-835 (Feb. 27, 1997).

{¶ 17} As we stated in *Lippert v. Med. College of Ohio,* 10th Dist. No. 92AP-741 (Dec. 1, 1992):

> While the Supreme Court has characterized R.C. 2743.02(F) proceedings as involving a legal issue, we recognize that, in some instances, a factual dispute underlies the primary issue of law involved in determining the state's responsibility for an employee's actions. To the extent a factual dispute underlies the predominant legal determination of immunity, the trial court should conduct an evidentiary hearing to resolve that factual dispute.

Accordingly, the May 15, 2013 hearing was held by the magistrate to resolve the disputed factual issues and rule on Dr. Ringer's legal entitlement to immunity.

{¶ 18} We followed the pertinent part of the opinion in *Conley* in *Fisher*, *Botkin*, *Schultz v. Univ. of Cincinnati College of Medicine,* 10th Dist. No. 09AP-900, 2010-Ohio-2071, ¶ 33, and also in *Ashcraft v. Univ. of Cincinnati Hosp.,* 10th Dist.  No. 02AP-1353, 2003-Ohio-6349, ¶ 22.  In these cases we overruled challenges to R.C. 2743.02(F), including the instant claims that the statute deprives appellants of a constitutional right to a jury trial and due process of law.  We are constrained to do so here as well.

{¶ 19} Appellants suggest that because under R.C. 2743.11 "[n]o claimant in the [C]ourt of [C]laims shall be entitled to have his civil action against the state determined by a trial by jury," with respect to their claims against Dr. Ringer, they are denied due process. But, *Conley* interprets and applies the statute so as to determine that the denial of a jury trial before the Court of Claims involves a procedural process and not a substantive right:

> If the Court of Claims determines that a state employee was acting outside the scope of employment and, therefore, is personally responsible for his or her acts and is subject to suit

> in a common pleas court, the plaintiff and the state employee retain the right to have a jury hear and determine all factual issues presented at trial. Thus, any right to a jury trial which Conley may have had was not infringed by the procedure found in R.C. 2743.02(F). Alternatively, because R.C. 2743.02(F) is procedural in nature, it does not violate any substantive rights, including the right to a trial by jury. *Shew v. Greene* (Apr. 24, 1989), Warren App. No. CA88-09-070, unreported, 1989 WL 38943.

*Id.* at 292.

{¶ 20} Consistent with the statutorily mandated unavailability of a jury trial in the Court of Claims, appellants made no demand for a jury at the time of the Court of Claims' proceedings. When they did move for a jury trial, it was *after* the immunity hearing by the magistrate, at a time long after that permitted by Civ.R. 38(B), were a jury trial available, and, according to statute, it was not. While we have recognized that "an appellate court has discretion to consider constitutional challenges to the application of statutes even where the waiver is clear," we decline to exercise such discretion in this case. *Ohio Am. Health Care, Inc. v. Ohio Bd. of Nursing,* 10th Dist. No. 13AP-1020, 2014-Ohio-2422, ¶ 40, citing *In re M.D.,* 38 Ohio St.3d 149 (1988), syllabus. The time for objecting to the statutory scheme denying a jury trial or for even demanding a trial by jury was before the hearing. Appellants' attempts to stretch that to any conceivable post-hearing time burst credulity when such objections occur beyond the time provided in Civ.R. 38. This court finds that appellants' waiver of objection to unavailability of a jury hearing in the Court of Claims is not saved by their constitutional challenge. This is not a specific case of plain error where the rights and interests involved may warrant consideration of the constitutional challenge. *M.D.* at 151 ("due process considerations of appellant's arguments [against prosecution of juveniles under 13 as delinquents for "playing doctor," allegedly constituting felony sex crimes] are apparent, and sufficient to avoid the waiver issue"). In appellants' case, *Conley* resolved appellants' challenge to the unavailability of a jury trial, and assignments of error seven, eight, and nine are overruled.

**B. Exclusion of Coroner's Office Administrator Affidavit**

{¶ 21} In their third assignment of error, appellants complain that Magistrate Shaver improperly excluded an affidavit dated May 9, 2013 (six days before the hearing) from the Hamilton County Coroner's office administrator, stating that Jessica's death was

not reported on August 23 or 24, 2006, contrary to chief resident Dr. Nicholas Levine's discharge summary and Dr. Ringer's testimony. Defense counsel objected that he would not have the opportunity to depose or cross-examine the affiant, and the magistrate sustained the objection to the affidavit.

{¶ 22} Overruling appellants' objection to exclusion of the affidavit, Judge McGrath held that the affidavit was hearsay, not subject to any exception. The affidavit may have been admissible under Evid.R. 803(10) "[t]o prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and preserved by" the coroner's office. Civ.R. 44(B) provides: "A written statement that after diligent search no record or entry of a specified tenor is found to exist in the records designated by the statement * * * is admissible as evidence that the records contain no such record or entry." However, the magistrate, in her discretion, could have excluded the affidavit for undue delay under Evid.R. 403(B), and exclusion would be mandatory insofar as the affidavit's probative value was substantially outweighed by the danger of unfair prejudice under Evid.R. 403(A).

{¶ 23} In any event, we find that any error in the exclusion of the coroner's office administrator's affidavit was harmless under Civ.R. 61 and R.C. 2309.59. While the affidavit may have impeached Dr. Ringer's testimony that the coroner had been contacted, appellants' attorney was permitted to refer to the affidavit, and the statement that Jessica's case was not reported on August 23 or 24, 2006, in his cross-examination of Dr. Ringer.

{¶ 24} The magistrate as the trier of fact retained the discretion to weigh credibility and to accept or reject the hospital discharge summary and Dr. Ringer's testimony concerning contacting the coroner.

> Decisions regarding the admissibility of evidence are within the broad discretion of the trial court. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126. A decision to admit or exclude evidence will be upheld absent an abuse of discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 164-165, 17 O.O.3d 98, 407 N.E.2d 490. Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice. Id.

*Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. "An abuse of discretion involves more than an error of law or of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable or arbitrary." *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.*, 63 Ohio St.3d 498, 506 (1992). The record is devoid of the indication that the magistrate acted unreasonably, unconscionably or arbitrarily in refusing to admit a late-submitted affidavit. Appellants have not shown that the affidavit's admission into evidence could have affected the Court of Claims' determination of whether or not Dr. Ringer acted outside his employment or otherwise "with malicious purpose, in bad faith, or in a wanton or reckless manner" to avoid his civil immunity under R.C. 9.86. Appellants' third assignment of error is overruled.

### C. Limitation of Discovery to Immunity Issue

{¶ 25} As to the fifth assignment of error, we perceive no abuse of discretion in the Court of Claims' limitation of discovery to the immunity issue. This was the necessary and entire scope of the determination below, given appellants' intention to pursue their claims against Dr. Ringer in the court of common pleas if they prevailed on the immunity issue. There is nothing to suggest that appellants would not have been permitted further discovery if the Court of Claims had rejected Dr. Ringer's claim of civil immunity.

{¶ 26} Nor were appellants deprived of any opportunity to pursue medical facts pertinent to the issue of immunity before the court. The protective order states: "Dr. Ringer shall be deposed only with regard to immunity issues, [appellants'] allegations of fraud and spoliation of evidence, and such limited inquiry into the allegations of medical malpractice as may be necessary for the immunity determination." (R. 52.) The Court of Claims did not protect from discovery matters related to appellants' allegations of fraud and spoliation by Dr. Ringer. In fact, it appears that the Court of Claims afforded appellants wide berth in seeking information that could lead to admissible evidence that would tend to prove that Dr. Ringer was not entitled to immunity. Nor do appellants identify any particular areas of inquiry during Dr. Ringer's deposition, or otherwise in discovery, where they were limited or deprived, and that could have helped them overcome immunity. Appellants obtained, presented, and continue to rely on medical testimony from Dr. Beckman regarding the advisability of a complete autopsy and concerning contacting the coroner. We are satisfied that appellants' counsel was not

limited in discovery in pursuing any matters related to Dr. Ringer's treatment of Jessica and its aftermath, including the limited autopsy. The evidence in the record supports the findings of the magistrate and the Court of Claims on the issue of immunity.

{¶ 27} " 'A trial court has broad discretion to regulate discovery proceedings. * * * This discretion extends to the issuance of protective orders made to pursuant to Civ.R. 26(C). * * * Absent an abuse of discretion, an appellate court must affirm a trial court's disposition of discovery issues.' " *Hahn v. Satullo*, 156 Ohio App.3d 412, 2004-Ohio-1057, ¶ 79 (10th Dist.), quoting *Van-American Ins. Co. v. Schiappa*, 132 Ohio App.3d 325, 330 (7th Dist.1999). *See Dehlendorf v. Ritchey*, 10th Dist. No. 12AP-87, 2012-Ohio-5193, ¶ 23 ("appellant fails to demonstrate how the requested depositions could lead to admissible evidence related to the issue of collateral estoppel and its application to the matter at hand. Thus, we conclude the trial court did not abuse its discretion in granting appellee's motion for a protective order").

{¶ 28} We find that the protective order in the Court of Claims was neither unreasonable, arbitrary, nor unconscionable. We therefore overrule appellants' fifth assignment of error.

### D.  Weight of the Evidence

{¶ 29} Appellants' challenge of the Court of Claims' decision that Dr. Ringer is entitled to civil immunity, based on the claim that it is against the weight of the evidence, is found in their sixth assignment of error. On the standard of review, this court stated in *Long*:

> [I]mmunity is a question of law. *Nease v. Medical College Hosp.* (1992), 64 Ohio St.3d 396, 400, 596 N.E.2d 432, citing *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 595 N.E.2d 862. While the issue of immunity is a question of law, consideration of the specific facts is necessary. See *Lowry v. Ohio State Highway Patrol* (Feb. 27, 1997), Franklin App. No. 96API07-835, unreported (1997 Opinions 524 at 533). In this regard, matters involving credibility should be resolved by the trial court, and judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as being against the manifest weight of the evidence. *Id.* at 533-534; *Brooks v. Ohio State Univ.* (1996), 111 Ohio App.3d 342, 350, 676 N.E.2d 162, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.

Applying the facts in a manner consistent with these principles, we determine whether or not Dr. Ringer was entitled to immunity as a matter of law. In doing so, we also consider our earlier decisions in *Young v. Univ. of Akron*, 10th Dist. No. 04AP-318, 2004-Ohio-6720, *Caruso v. State,* 136 Ohio App.3d 616 (10th Dist.2000), *Jodrey v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 12AP-477, 2013-Ohio-289, and *Lewis v. Cleveland State Univ.,* 10th Dist. No. 10AP-606, 2011-Ohio-1192, concerning "weight of the evidence" challenges to the Court of Claims' adoption of magistrates' reports concerning R.C. 9.86 immunity.

### 1.  Immunity Generally Under R.C. 9.86

{¶ 30}  R.C. 9.86 provides in relevant part:

> [N]o officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Appellants do not take issue with the facts supporting Dr. Ringer's formal and working status as a state employee under R.C. 109.36(A)(1)(a) or that he "was acting on behalf of the state when the patient was alleged to have been injured." *Theobald* at ¶ 31.  At all relevant times Dr. Ringer was employed and paid by the University of Cincinnati.  Dr. Levine and Endovascular Surgical Neuroradiology Fellow Dr. Shah-Naz Khan participated with Dr. Ringer throughout Jessica's treatment.  Appellants urge that Dr. Ringer's conduct is not shielded by immunity because his conduct was motivated by actual malice or other such reasons giving rise to punitive damages.  Appellants urge that on this basis the employer-employee relationship should be deemed severed, or that he acted with malicious purpose, in bad faith, or in a wanton or reckless manner.  *Elliott v. Ohio Dept. of Rehab. & Corr.,* 92 Ohio App.3d 772, 775 (10th Dist.1994).

{¶ 31}  We delineated these grounds to defeat immunity in *Caruso*:

> In the context of immunity, an employee's wrongful act, even if it is unnecessary, unjustified, excessive, or improper, does not automatically take such act manifestly outside the scope of employment. *Elliott v. Ohio Dept. of Rehab. & Corr.* (1994), 92 Ohio App.3d 772, 775, 637 N.E.2d 106, 107-108, citing *Thomas v. Ohio Dept. of Rehab. & Corr.* (1988), 48 Ohio

App.3d 86, 89, 548 N.E.2d 991, 994; and *Peppers v. Ohio Dept. of Rehab. & Corr.* (1988), 50 Ohio App.3d 87, 90, 553 N.E.2d 1093, 1095-1096; *Brooks* [*v. Ohio State Univ.*, 111 Ohio App.3d 342,] 350, 676 N.E.2d at 166-167. It is only where the acts of state employees are motivated by actual malice or other such reasons giving rise to punitive damages that their conduct may be outside the scope of their state employment. *James H. v. Dept. of Mental Health and Mental Retardation* (1980), 1 Ohio App.3d 60, 61, 1 OBR 6, 7-8, 439 N.E.2d 437, 438-439. The act must be so divergent that it severs the employer-employee relationship. *Elliott*, at 775, 637 N.E.2d at 107-108, citing *Thomas*, at 89, 548 N.E.2d at 994, and *Peppers*, at 90, 553 N.E.2d at 1095-1096.

Malicious purpose encompasses exercising "malice," which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified. *Jackson v. Butler Cty. Bd. of Cty. Commrs.* (1991), 76 Ohio App.3d 448, 453-454, 602 N.E.2d 363, 366-367, citing *Teramano v. Teramano* (1966), 6 Ohio St.2d 117, 118, 35 O.O.2d 144, 144-145, 216 N.E.2d 375, 376-377; and *Bush v. Kelley's Inc.* (1969), 18 Ohio St.2d 89, 47 O.O.2d 238, 247 N.E.2d 745.

"Bad faith" has been defined as the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another. *Lowry*, supra, quoting Black's Law Dictionary (5 Ed. 1979) 127. Bad faith is not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. *Id.*

Finally, "reckless conduct" refers to an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent. *Hackathorn v. Preisse* (1995), 104 Ohio App.3d 768, 771, 663 N.E.2d 384, 386, citing *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705, 707-708, citing 2 Restatement of the Law 2d, Torts (1965) 587, Section 500. The term "reckless" is often used interchangeably with the word "wanton" and has also been held to be a perverse disregard of a known risk. *Jackson*, citing *Thompson*, at 104, 559 N.E.2d at 708, fn. 1, and *Poe v. Hamilton* (1990), 56 Ohio App.3d 137, 138, 565 N.E.2d 887, 888-889. As to all of the above terms, their definitions connote a mental state of

> greater culpability than simple carelessness or negligence. See *Jackson, supra*, at 454, 602 N.E.2d at 367.

*Id.* at 620-21.

{¶ 32} We further discussed in *Wrinn v. Ohio State Hwy. Patrol,* 10th Dist. No. 11AP-1006, 2013-Ohio-1141, ¶ 13, that the Supreme Court has clarified the differences between willful, wanton, and reckless conduct in the context of political subdivision employee immunity afforded by R.C. 2744.02(B)(1)(b) and 2744.03(A)(6)(b).

> 1. "Willful," "wanton," and "reckless" describe different and distinct degrees of care and are not interchangeable. (*Thompson v. McNeill*, 53 Ohio St.3d 102, 559 N.E.2d 705 (1990), modified.)
>
> 2. Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury. (*Tighe v. Diamond*, 149 Ohio St. 520, 80 N.E.2d 122 (1948), approved and followed.)
>
> 3. Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. (*Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977), approved and followed.)
>
> 4. Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. (2 Restatement of the Law 2d, Torts, Section 500 (1965), adopted.)

*Anderson v. Massillon,* 134 Ohio St.3d 380, 2012-Ohio-5711, paragraphs one, two, three, and four of the syllabus.

### 2. Admissibility of Hospital Discharge Summary as it Relates to Immunity

{¶ 33} Appellants particularly assail the Court of Claims' reliance on the hospital discharge summary to support its finding that Jessica's death was reported to the Hamilton County Coroner's office.   In addition to exclusion of the administrator's

affidavit, as to which we have found no abuse of discretion, appellants object to the hospital discharge summary as inadmissible hearsay. However, at the magistrate's hearing, appellants agreed to admission of the medical records into evidence, including the discharge summary. Failing to object at the hearing to admissibility of any part of the medical record, including the discharge summary, appellants have waived this argument on appeal. *See Jefferson v. CareWorks of Ohio, Ltd.*, 193 Ohio App.3d 615, 2011-Ohio-1940, ¶ 9 (10th Dist.).

{¶ 34} Dr. Ringer was uncertain whether he or another member of the medical staff had contacted the coroner, and he acknowledged that it is customary to notify the coroner's office when a patient dies after a procedure. Further, considering the hospital discharge summary under the "business records" exception to the hearsay rule, Evid.R. 803(6), we are constrained to uphold the Court of Claims' ruling on its admissibility because appellants interposed no objection to admissibility to any of this part of the record. "Failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." *Claffey v. Natl. City Bank*, 10th Dist. No. 11AP-95, 2011-Ohio-4926, ¶ 15, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). Consistent with having stipulated to the records' admissibility, appellants presented no argument that any portion of the records, including the discharge summary, was not admissible under Evid.R. 803(6). *See OhioHealth Corp. v. Ryan*, 10th Dist. No. 10AP-937, 2012-Ohio-60, ¶ 34 (appellant did not move to strike account evidence potentially subject to objection and a finding of inadmissibility under Evid.R. 803(6) and therefore waived any error in consideration of exhibit on summary judgment); *Lambert v. Shearer*, 84 Ohio App.3d 266, 278 (10th Dist.1992) (expert properly allowed to testify on basis of medical records stipulated as authentic and admitted under Evid.R. 803(6)).

{¶ 35} Additionally, we do not find that the asserted error holds any serious effects for the " 'basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *Claffey* at ¶ 15, quoting *Goldfuss* at 123. *Claffey* informs us that there is no plain error compelling reversal.

{¶ 36} As we view it, appellants misplace their reliance on *McQueen v. Goldey*, 20 Ohio App.3d 41 (12th Dist.1984). The statements at issue in *McQueen* concerned the way

in which the motor vehicle accident occurred and for which the plaintiff was treated for injuries. In *McQueen*, the court did not find a business records hearsay exception existed pursuant to Evid.R. 803(6). Nor did it find exception for statements made for purposes of medical diagnosis or treatment as would be permissible pursuant to Evid.R. 803(4). The Twelfth District held that the alleged error in admitting the statements was not prejudicial, because "[t]he statements were merely cumulative and corroborative of the testimony of other witnesses." *Id.* at 44. Likewise, the discharge summary report corroborates Dr. Ringer's testimony at the hearing.

{¶ 37} " '[M]atters involving credibility should be resolved by the trial court, and judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as being against the manifest weight of the evidence.' " *Botkin* at ¶ 17, quoting *Scarberry v. Ohio State Univ. Hosps.,* 10th Dist. No. 98AP-143 (Dec. 3, 1998).

{¶ 38} The hospital discharge summary, dictated by Dr. Levine, includes the following language: "The appropriate parties including the patient's family and the coroner were notified. The coroner declined an autopsy; however, at the physician's request and the patient's family's approval an autopsy will be obtained." (Defendant's exhibit D, 18.) It was appellants' attorney who elicited the corroborating testimony from Dr. Ringer that one member of his team would have contacted the coroner. In his direct testimony, Dr. Ringer stated, consistent with the discharge summary, that Dr. Levine had indicated that the coroner was not planning an autopsy. He continued, "[T]hat's when I felt we should approach the Siegels about doing one ourselves." (Tr. 216.) Dr. Levine did not testify, and regardless of the magistrate's decision to exclude the coroner's affidavit, it was within the province of the Court of Claims to accord Dr. Ringer's testimony the weight it deserved and to judge his credibility.

{¶ 39} Finally, appellants' untimely objection to the discharge summary does not avail their claim that the Court of Claims' decision is against the weight of the evidence. Appellants grafted their first-time arguments against admissibility of the discharge summary onto their weight-of-the-evidence claims, which we reject on account of waiver and *McQueen.*

### 3.  Decision to Limit Autopsy and Changes to Consent Form

{¶ 40} Appellants chiefly argue that Dr. Ringer's decision not to order a complete autopsy bespoke fraud, spoliation, and other conduct sufficient to avoid immunity.  They believe that the court ignored Dr. Beckman's deposition testimony that exclusion of the brain from the autopsy appeared unusual since Dr. Ringer had performed a brain operation.  However, Dr. Beckman made it clear that it was Dr. Ringer's "call" to define the scope of the autopsy.  Dr. Beckman accordingly limited the autopsy to the thorax and abdomen to check for a pulmonary embolus, and a test of the muscle tissue for malignant hyperthermia.  Dr. Ringer had informed Dr. Beckman at the time that the intracranial pressure was normal, so Dr. Ringer did not want an autopsy of the brain.  While he agreed that normal intracranial pressure would not rule out a cause of death within the brain itself, nothing in Dr. Beckman's testimony or elsewhere in the record suggests that an autopsy of the brain would have revealed information not already available in the imaging studies and other records, or anything at variance with the complications identified following the August 14, 2006 procedure, including the hematoma resulting in increased intracranial pressure.

{¶ 41} Dr. Beckman allowed through his testimony that it would have been of use to examine the brain, but he could not say whether it was unusual to forgo a brain autopsy for Jessica's specific condition.  Dr. Beckman did not indicate or intimate any desire to conceal information by Dr. Ringer, or any type of wrongdoing by him, let alone conduct sufficient to overcome immunity.

{¶ 42} Appellants dispute the Court of Claims' finding that "Dr. Ringer's requested correction of the autopsy consent form does not demonstrate actual malice, particularly when the document had not yet been completed." (R. 90, at 5.) At the evidentiary hearing, Mr. Siegel acknowledged that Dr. Ringer had explained the genetic concern for Jessica's family members about malignant hyperthermia relating to the proposed muscle biopsy.  But Mr. Siegel claimed that he had asked for an autopsy of Jessica's brain also, and that Dr. Ringer agreed.  Mr. Siegel further stated that he had signed the form in the presence of Drs. Ringer and Levine, and was in no hurry to leave the hospital after his daughter's death.

{¶ 43} In her deposition testimony, which appellants moved into evidence, Nurse Amie Smith averred to the contrary that Mr. Siegel had signed the autopsy request form while it was still blank because the family did want to leave the hospital. Smith filled out the form, indicating a complete autopsy, including head and brain, but Dr. Ringer corrected her. Dr. Ringer told Smith that he was looking for the two specific conditions and it was not necessary to risk further disfigurement of the brain.

{¶ 44} On cross-examination, defense counsel elicited that Mr. Siegel had not read the autopsy report until approximately one year after Jessica's death, and at his deposition in the family's lawsuit against the LifeCenter Organ Donor Network, Mr. Siegel said that his main concern was that Jessica's eyes had been harvested for transplantation. His position that the Siegels had denied consent to donate Jessica's eyes but wanted an autopsy of her brain raised a point of credibility. The Court of Claims resolved the conflicting testimony over whether appellants had asked for an autopsy of the brain in favor of Dr. Ringer, and further found that "if Dr. Ringer were trying to mislead or deceive [appellants], he would not have requested an autopsy at all." (R. 90, at 3-4.)

{¶ 45} As we stated in *Romano's Carryout, Inc. v. P.F. Chang's China Bistro, Inc.*, 196 Ohio App.3d 648, 2011-Ohio-4763, ¶ 7 (10th Dist.):

> Under the manifest-weight-of-the-evidence standard, when competent, credible evidence exists supporting the findings and conclusions of the trial court, an appellate court must affirm the trial court's judgment. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614, 614 N.E.2d 742. The manifest-weight-of-the-evidence standard requires an appellate court to presume that the findings of a trier of fact are correct. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. This presumption arises because the trier of fact, who can observe the witnesses' demeanor, gestures, and voice inflections, is best able to weigh and judge the credibility of the proffered testimony. *Id.* Consequently, an appellate court cannot reverse a decision simply because it holds a different opinion regarding the credibility of the witnesses and evidence before the trial court. *Wilson* at ¶ 24; *Seasons Coal Co.* at 81, 461 N.E.2d 1273.

Despite Mr. Siegel's insistence that he had asked for an autopsy of Jessica's brain, and appellants' argument that his consent required nothing less than a complete autopsy, the

testimony of Smith, Drs. Beckman and Ringer on the circumstances resulting in a limited autopsy provided competent, credible evidence that Dr. Ringer did not act outside the scope of his employment, with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶ 46} In *Botkin*, we affirmed the Court of Claims' decision that an appellee physician did not act with malicious purpose, in bad faith, or in a wanton or reckless manner. We did so under circumstances where an addendum was made to the initial operative report, deposition testimony provided a reasonable explanation for the subsequent report, and there was evidence that the appellee had no part in the creation of that document. *Id.* at ¶ 20. In *Botkin*, the appellants' attorney sought to raise the inference that the later report was part of a broader scheme by others, including the appellee physician, to falsify records and conceal the original report. Here, appellants similarly maintain that Dr. Ringer's failure to arrange for a complete autopsy at the hospital or by the coroner was part of a plan and "cover up" by Dr. Ringer.

{¶ 47} Beyond insinuation, appellants did not identify what they believe Dr. Ringer was attempting to conceal. Taking into account the Court of Claims' decision to not limit discovery as to appellants' fraud and spoliation claims, appellants could have presented one or more expert witnesses or other medical evidence to establish that a full autopsy could have revealed what was not already apparent from the pre-death brain imaging studies and other records available to them. Dr. Ringer has maintained that the hematoma and increased intracranial pressure did not cause Jessica's death. Yet, appellants seem to make the assertion that, had the autopsy ordered included an analysis of Jessica's brain, it could have shown evidence of malpractice beyond what may be gathered already from the records and imaging studies. Appellants appear to contend that Dr. Ringer was at fault for the hematoma and increased intracranial pressure, but they did not establish before the Court of Claims that avoiding an autopsy may have concealed that these conditions proximately caused death. Nor did they offer evidence to rule out that already existing records relating to Jessica's brain in the form of imaging studies conducted in the course of Jessica's treatment failed to fulfill the purpose that an autopsy would, toward proving their allegations that Dr. Ringer's conduct was such to prevent a finding of immunity.

### 4. Finding of Immunity Supported by Competent and Credible Evidence

{¶ 48} "When presented with a manifest weight of the evidence argument, an appellate court will not overturn a judgment which is supported by some competent, credible evidence going to all essential elements of the case." *Norman v. Ohio State Univ. Hosps.*, 116 Ohio App.3d 69, 73 (10th Dist.1996), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. As we further discussed in *Young*:

> Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered ." *Caldwell v. Ohio State University*, Franklin App. No. 01AP-997, 2002-Ohio-2393, at ¶ 56, quoting *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. A judgment is not against the manifest weight of the evidence merely because inconsistent evidence was presented at trial. Cf. *State v. Raver*, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The appellate court must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. *Caldwell*, supra; see, also, *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on manifest weight grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the [judgment]." *Caldwell*, supra, quoting *Thompkins*, supra, at 387, 678 N.E.2d 541.

*Id.* at ¶ 25. Evidence at the hearing sufficed to support the magistrate's findings and recommendations, adopted by the Court of Claims, that Dr. Ringer was a state employee, acting on behalf of the state and within the scope of his employment, and did not act with malicious purpose, in bad faith, or in a wanton or reckless manner during his treatment and care of Jessica.

{¶ 49} In summary, the testimony of Dr. Beckman and Smith, along with Dr. Ringer's testimony, supported the finding that Dr. Ringer's purpose in requesting the autopsy, however limited, was to determine the cause of Jessica's death. In addition to Dr. Ringer's testimony, Dr. Levine's discharge summary supports the finding that the coroner's office was contacted but declined to perform an autopsy. The imaging studies and other hospital records documented the condition of Jessica's brain during her

treatment by Dr. Ringer. Appellants did not establish what information a brain autopsy would have yielded additionally to show a diversion from protocol and post-mortem activity to place his actions outside the scope of his employment, let alone find clear grounds for a finding of malicious purpose, bad faith, or wanton or reckless conduct, as described in *Caruso* and *Anderson* to justify reversal. We cannot conclude that the evidence weighs heavily against the judgment that Dr. Ringer is entitled to civil immunity. The sixth assignment of error is overruled.

### E. Appellants' Claim of Non-disclosure of Facts Affecting Immunity

{¶ 50} Finally, in the tenth assignment of error, appellants claim that the finding of immunity was erroneous because Dr. Ringer did not disclose the details and consequences of his state employee status and immunity. In *Fisher*, we held that "whether appellant was informed and/or consented to [the physician] treating her as a 'loaned servant,' [is] irrelevant to the determination of whether [the physician] was employed by the state pursuant to R.C. 2743.02(F)." In *Schultz*, we rejected the assertion that since he was never informed of the physician's state employment, the plaintiff could not have consented to be treated by a state employee. *Id.* at ¶ 46. As to the legal ramifications, including civil immunity for state employees, "[i]t is an ancient maxim that all are conclusively presumed to know the law." *State v. Pinkney,* 36 Ohio St.3d 190, 198 (1988).

{¶ 51} In this matter, appellants' counsel unfortunately formulates the charges more audaciously (though without legal explication) as false and misleading misrepresentations, and failure to disclose a claimed unnamed principal insofar as Dr. Ringer was employed by the state while treating his patient at a hospital that was not owned by the state. In *Lowry*, we rejected the suggestion that similarly uninformed plaintiffs were deprived of their First Amendment right of redress on the basis that they were still afforded the opportunity to pursue their claims against state entities.

{¶ 52} Appellants identify no legal or evidentiary basis for a duty to disclose the facts of the physician's status as a state employee. We reiterate that information received by appellants regarding Dr. Ringer's employee status is irrelevant to the determination of the Court of Claims as to immunity, that is, whether he actually was a state employee and acting on behalf of the state when the patient was alleged to have been injured. As we

have found in our review of other assignments of error, appellants are unable to point to evidence that malice, bad faith, a failure to exercise any care at all (wanton misconduct), or conscious disregard of or indifference to a known or obvious risk of harm (recklessness) lay behind their not being specifically informed of his employment status. *See Wrinn* at ¶ 12-13. Despite their further remonstrance that Dr. Ringer never informed Mr. Siegel that he could obtain the test for malignant hyperthermia but still request an autopsy of the brain, and that Dr. Ringer did not disclose to the Siegels that he limited the autopsy in any way, the record contains ample support for the conclusion that appellants were unable to prove at the Court of Claims, and in our review of that court's decision, that Dr. Ringer acted outside the scope of his employment, with malicious purpose, in bad faith, or in a wanton or reckless manner during his care and treatment of Jessica. Appellants' tenth assignment of error is overruled.

## III.  CONCLUSION

{¶ 53} We thus overrule appellants' ten assignments of error, and the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

CONNOR, P.J., concurs.
DORRIAN, J., concurs in judgment only.