**[Cite as *Siegel v. State*, 2020-Ohio-4708.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Frances B. Siegel, Individually and as Administratrix of the Estate of Jessica A. Siegel, et al., | : | |
| | : | **No. 19AP-355** |
| Plaintiffs-Appellants, | : | (Ct. of Cl. No. 2009-09531JD) |
| v. | : | (REGULAR CALENDAR) |
| State of Ohio, d.b.a. University of Cincinnati College of Medicine, et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

P L U R A L I T Y   D E C I S I O N

Rendered on September 30, 2020

**On brief:** *John H. Metz*, for appellants. **Argued:** *John H. Metz.*

**On brief:** *Dave Yost*, Attorney General, and *Brian M. Kneafsey, Jr.*, for appellees. **Argued:** *Brian M. Kneafsey, Jr.*

APPEAL from the Court of Claims of Ohio

BRUNNER, J, lead author.

{¶ 1} Plaintiffs-appellants, Frances and Daniel Siegel (collectively "the Siegels") appeal a decision of the Court of Claims of Ohio granting summary judgment against them on claims arising out of the death and alleged efforts to conceal its cause of their 16-year-old daughter, Jessica Siegel. Construing the evidence most strongly in favor of the Siegels, we find that the summary judgment record supports the inference that Jessica's doctor took steps to destroy evidence of the cause of death and subsequently misled the Siegels about having done so. Consequently, the causes of action for fraud and spoliation would have accrued only when the plaintiffs found out about the doctor's actions. We therefore find that the claims for spoliation and fraud were not time-barred on this record, and we partly

reverse the decision of the trial court. But because a majority of the court agrees that the medical malpractice, contract, and wrongful death claims were time-barred, we also affirm in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The record to this point for summary judgment purposes reflects when Jessica was 9 years old, her parents discovered that she suffered from a serious condition known as arteriovenous malformation ("AVM"). (Hearing Tr. at 93.) AVM is a condition where the arteries in the brain connect directly to low pressure veins, rather than shunting blood through capillaries where it can perform its functions of nutrient dispersal and waste collection. *Id.* at 23-24. Introducing high-pressure arterial blood directly into low-pressure veins without first dispersing it through capillaries creates a risk of hemorrhage, and the condition (in the grade from which Jessica suffered) carries a 1-2 percent annual risk of disability or death. *Id.* (Siegel Hearing Ex. 9 at 4). A 1-2 percent annual risk means that over the course of, for example, 60 years, the chance of living the entire time without a disabling or fatal event falls between approximately 55 percent and 30 percent.[1]

{¶ 3} In 2006, Jessica was referred to defendant-appellant, Dr. Andrew Ringer, for a consultation. (Hearing Tr. at 22-23.) By the time of the consultation in March 2006, she was a few months shy of her 16th birthday and had already undergone one embolization procedure (in 1999) and radiosurgery (in 2004). (Siegel Hearing Ex. 9 at 2.) During the consultation, although Jessica was not then suffering from any symptoms of AVM, Dr. Ringer suggested that, through a glue embolization procedure, he could seal the troublesome connections in the "nidus"[2] to reduce the severity of or perhaps eliminate her AVM. *Id.* at 4.

{¶ 4} The first embolization attempt by Dr. Ringer occurred on July 19, 2006. (Siegel Hearing Ex. 6 at 1.) Dr. Ringer noted "suspicious extravasation of the onyx agent that did not appear to conform to the usual vascular patterns." *Id.* at 3. Or, in layman's terms, the glue leaked outside the blood vessels into the surrounding brain tissue.[3] Dr. Ringer also recorded incidents including accidental filling of normal cortical branches,

---

[1] $(100\%-1\%)^{60}=54.72\%$ and $(100\%-2\%)^{60}=29.75\%$

[2] The "nidus" is the term used to refer to the arteriovenous tangle. (Hearing Tr. at 34.)

[3] "Extravasation" is defined as "[t]he escape of an organic fluid (e.g. blood, sap) from its proper vessels into the surrounding tissues; an instance of this." *Oxford English Dictionary*, www.oed.com/view/Entry/67155 (Online Ed.Sept.2019).

buckling of the catheter (through which the glue was extruded), and an apparent vascular perforation that he attempted to address using "immediate" embolization. *Id.* After multiple unsuccessful attempts to complete the operation's goals over the course of five hours, Dr. Ringer withdrew and closed. *Id.* at 3-4.

{¶ 5} The next and final attempt to embolize Jessica's AVM occurred on August 14, 2006. (Siegel Hearing Ex. 8 at 35.) The first stage of the embolization was successful. *Id.* at 36. However, during the second stage of the procedure in which Dr. Ringer attempted to advance a catheter into the lenticulostriate[4] branch, he again noted extravasation and was not able to successfully embolize the lenticulostriate branch. *Id.* at 37. In a final attempt, Dr. Ringer was unable to advance the glue-delivering catheter sufficiently into the lenticulostriate branch. *Id.* Then he noticed a filling defect in the right middle cerebral artery which had not previously been present and which appeared to be a result of glue used to embolize a branch from the middle cerebral artery. *Id.* He therefore ordered a bolus[5] of anti-clotting medicine and aborted the procedure. *Id.* Jessica was admitted to the hospital on an anticoagulant drip when she woke from the procedure and she showed sleepiness secondary to sedation as well as some weakness and facial droop on her left side. (Siegel Hearing Ex. 7 at 1-2.)

{¶ 6} Shortly after midnight, Jessica showed further sleepiness and doctors noted displacement of the basofrontal lobe and increased hematoma in her right frontal lobe extending into the basal ganglia. *Id.* at 2. The anticoagulant medication was stopped and Jessica was "loaded" with anti-seizure medication. *Id.* But despite these precautions, she had a seizure at approximately 1:00 p.m. on August 15th. *Id.* The medical team intubated her and began efforts to stabilize her intracranial pressure in light of scans showing a midline shift in her brain. *Id.*

{¶ 7} The following day, in addition to continuing on the ventilator and continuing to attempt to control her intracranial pressure, the treating team placed a feeding tube. *Id.* at 2-3.

---

[4] Defined as "a branch of the middle cerebral artery supplying the corpus striatum." *Merriam-Webster Dictionary*, https://www.merriam-webster.com/medical/lenticulostriate%20artery (accessed Sept. 29, 2020).

[5] "A single dose of a drug, contrast medium, etc., introduced rapidly into a blood vessel." *Oxford English Dictionary*, www.oed.com/view/Entry/21165 (Online Ed.Sept.2019).

{¶ 8}   On August 17th, Jessica's pupils became dilated and nonreactive.  *Id.* at 3.  Treatment with drugs, drains, and elevating her head relieved the issues.  *Id.*

{¶ 9}   The next day, Jessica continued to drain cerebrospinal fluid and efforts continued to attempt to relieve intracranial pressure.  *Id.*  The treatment team noted that she had developed pneumonia and started her on antibiotics.  *Id.*  However, on the evening of the 18th, Jessica again exhibited nonreactive dilated pupils and imaging of her brain showed increased midline shift and other effects indicative of swelling and intracranial pressure build up.  *Id.*  As a consequence of these negative changes, Jessica underwent a hemicraniectomy and duraplasty.[6]  *Id.*

{¶ 10}  The next morning, August 19, 2006, Jessica displayed reactive pupils again and the flap where her skull had been removed was soft and partially sunken, showing a decrease in intracranial pressure.  *Id.* at 3-4.  She continued in this stable condition being treated for intracranial pressure and pneumonia until the morning of August 23, 2006, when her fever abruptly rose to 104.4 degrees.  *Id.* at 4.  Despite the high fever, medical staff performed a planned tracheostomy to provide an alternative to intubation.  *Id.*  Following this procedure, the medical team noted Jessica was experiencing a very fast heart rate and had an increased need for oxygen.  *Id.*  Her fever also rapidly increased again, this time to 108 degrees. *Id.*

{¶ 11} Efforts continued throughout the afternoon to bring her heart rate under control and to lower her temperature.  *Id.* at 4-5.  The treating team also noted that she was exhibiting metabolic acidosis and her blood pH had fallen to 7.17.[7]  *Id.* at 5.  By the evening, her heart rate had fallen to approximately 130 beats per minute.  *Id.*  However, at 6:50 p.m. while the treating team was down the hall and away from her room, Jessica's heart stopped.  *Id.*  Cardiopulmonary resuscitation, seven rounds of epinephrine and atropine, and other resuscitative measures failed to recover a pulse.  *Id.*  Jessica was pronounced dead shortly after 7:00 p.m. on August 23, 2006.  (Siegel Hearing Ex. 13.)

---

[6] This is a procedure where a large flap of the skull is removed and the dura is opened to give space for a swollen brain to bulge, thereby reducing intracranial pressure. (Hearing Tr. at 204.) *See also, e.g.*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/medical/craniectomy (accessed Sept. 29, 2020).

[7] "Acidosis" is defined as "an abnormal condition characterized by reduced alkalinity of the blood and of the body tissues*." Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/acidosis (accessed Sept. 29, 2020).

{¶ 12} The medical records dictated by the chief resident, Dr. Nicholas Levine, indicated that the coroner's office was contacted and declined to take jurisdiction to autopsy Jessica's body. (Siegel Hearing Ex. 7 at 5.) Dr. Ringer also later testified that the coroner's office would have been contacted by a member of the treating team but that he did not recall who did it in this case. (Hearing Tr. at 39, 81.) However, the Siegels submitted an affidavit from the coroner for Hamilton County, Ohio and an affidavit from the office administrator for the Hamilton County Coroner's Office. (Sammarco Aff., attached to Oct. 17, 2018 Memo. in Opp. to Summ. Jgmt.; Hatten Aff., attached to Oct. 17, 2018 Memo. in Opp. to Summ. Jgmt.) Both affiants averred that, of the many matters reported to and recorded by the Hamilton County Coroner's Office in August 2006, the death of Jessica Siegel was not among them. (Sammarco Aff. at ¶ 5-7; Hatten Aff. at ¶ 5-6.)

{¶ 13} According to the testimony of Daniel Siegel, when he and his wife were spending time with Jessica's body shortly after she was declared dead, someone came into the room and told him that Dr. Ringer wanted a word. (Hearing Tr. at 108-09.) Siegel said that when he stepped out of the room, Dr. Ringer and his resident, Dr. Levine, were waiting. *Id.* They suggested that malignant hyperthermia may have caused Jessica's death and suggested that an autopsy involving a muscle biopsy could be done to confirm the hypothesis. *Id.* at 109. Siegel told the doctors that, if they were going to do an autopsy, he wanted one done on her brain as well because he wanted to understand what had happened to his daughter. *Id.* at 109-10. Dr. Ringer assented to that request. *Id.* at 110. Siegel then signed a form that stated:

> I (We) request and authorize the physicians and surgeons in attendance at the Good Samaritan Hospital to perform a complete autopsy on the remains of *Jessica Siegel* and I (we) authorize the removal and retention or use for diagnostic, scientific or therapeutic purposes of such organs, tissues, and parts as such physicians and surgeons deem proper.

(Italics denotes handwritten text.) (Siegel Hearing Ex. 5.) Below that paragraph, the form's printed text read:

> The following post-mortem examination shall be made.
> **(CHECK ONLY ONE)**
>
> 1. Brain _____
> 2. Thorax _____
> 3. Heart _____

4. Lung _____
5. Abdomen _____
6. Limited to thorax and abdomen (no head) _____
7. Specific abdomen organ (state) _____
8. Complete (including head and brain) _____

*Id.* Siegel testified that at the time when he signed the form, he was authorizing a complete autopsy, including Jessica's head. (Hearing Tr. at 109-12, 120.) Although he could not remember the precise extent to which the form was filled out when he signed it, he remembered that his daughter's name was already filled in and that no limitation was noted on the form to circumscribe the scope of the autopsy. *Id.* at 110-12, 126-27.

{¶ 14} Siegel testified that it took approximately until November or early December 2006 to obtain the autopsy report from the hospital. *Id.* at 114-16. It then was some time before he could summon the will to read his daughter's autopsy. *Id.* at 116. The first page of the autopsy report contains the following language:

**Autopsy Restrictions:** None
NO HEAD

(Autopsy Report at 1, Ex. 2 to Beckman Dep., filed as Siegel Hearing Ex. 16.) And, consistent with the "NO HEAD" notation, although the autopsy notes that a right craniectomy had been done, it states that there was "no permission for removal of the brain." *Id.* at 2, 4. After Siegel finally read the autopsy, he and his sister-in-law met with Dr. Ringer approximately one year after Jessica's death. (Hearing Tr. at 132-33.) During the meeting with Dr. Ringer, Siegel asked why an autopsy of Jessica's brain was not done and Dr. Ringer claimed that he did not know. *Id.* at 117-18. According to Siegel, no one on the treatment team ever told him that the autopsy form was altered after he signed it. *Id.* at 113. And he did not find out that Dr. Ringer was the person who ordered the alteration limiting the autopsy until (in connection with a case against an organ donation center for harvesting Jessica's eyes without permission) he took the deposition of a nurse on Jessica's treatment team. *Id.* at 118-20.

{¶ 15} The deposition of registered nurse, Amie Smith, took place on December 17, 2008. (Smith Dep. at 1, filed as Siegel Hearing Ex. 15.) Smith testified that Dan Siegel signed the autopsy form in blank. *Id.* at 45. She filled it in later in the presence of Dr. Ringer and originally checked the box for a complete autopsy. *Id.* at 47. But Dr. Ringer told her to

change it and not do a complete head and brain autopsy because, "[t]hat's not why she died." *Id.* Accordingly, she changed the autopsy form to read as follows:

The following post-mortem examination shall be made.
**(CHECK ONLY ONE)**

1. Brain _____
2. Thorax _____
3. Heart _____
4. Lung _____
5. Abdomen _____
6. Limited to thorax and abdomen (no head) ____√_____
   *and muscle biopsy for malignant hyperthermia*
7. Specific abdomen organ (state) _____
8. Complete (including head and brain) ____√_____
   *ERROR - AS 8/23/06 2030*

(Italicized text is handwritten.) (Siegel Hearing Ex. 5; *see also* Smith Dep. at 47-48.) According to Smith, Dr. Ringer then filled out a corresponding order sheet ordering an autopsy and muscle biopsy to check for pulmonary embolism and malignant hyperthermia. (Smith Dep. at 49; Siegel Hearing Ex. 8 at 22.) Smith made clear that at no time did she tell the Siegels that the autopsy was to be a limited autopsy. (Smith Dep. at 71.)

{¶ 16} Daniel Siegel's sister-in-law (who was Jessica's maternal aunt) also offered testimony in the case. (Hearing Tr. at 157.) She confirmed that she and Jessica's father visited Dr. Ringer approximately one year after Jessica's death and that Dr. Ringer claimed during that meeting not to know why Jessica's brain was not autopsied. *Id.* at 160-61. Although she confirmed that she knew that Jessica's brain had not been autopsied by the time she and Daniel Siegel met with Dr. Ringer and although she acknowledged that she had seen portions of the autopsy report around the time the family first received it in November or December after Jessica's death, she was unclear about when exactly she learned that Jessica's brain had not been examined. *Id.* at 161-65.

{¶ 17} Frances Siegel (Jessica's mother) testified briefly, confirming that Daniel Siegel had been called from their daughter's bedside shortly after her death and that they first read the autopsy report approximately one year after Jessica's death. *Id.* at 150-51, 154-55.

{¶ 18} Dr. Ringer testified that it was his idea to do an autopsy and that he did so because he wanted to determine if Jessica had died of malignant hyperthermia. *Id.* at 50-

56. He said he decided not to have her head autopsied because, based on multiple CT scans and other imaging obtained during her hospital stay, he felt he knew what was happening intracranially and that an autopsy of her head would have further disfigured her while adding nothing to the analysis. *Id.* at 55-56. He did not explain that analysis to Daniel Siegel. *Id.* at 56. But he nonetheless directed Nurse Smith to alter the form after Daniel Siegel signed it and after she checked the line indicating a complete autopsy should be done. *Id.* at 53-54, 64-66. He also spoke orally with the pathologist performing the autopsy and again made clear that the autopsy should not include an examination of Jessica's head. *Id.* at 56-59.

{¶ 19} Dr. Ringer remembered meeting with Jessica's father after the autopsy report but denied a recollection of what he said when Daniel Siegel asked why the autopsy was limited. *Id.* at 73-76. He admitted that, had the case been reported to the Hamilton County Coroner and had the coroner taken jurisdiction and performed an autopsy, he could not have limited the scope of the autopsy the coroner would have performed. *Id.* at 81. However, he admitted that since the autopsy was kept in house at the hospital where he practiced, he could have, and did, limit the autopsy to exclude examination of Jessica's head and brain. *Id.* at 81-82. Finally, even though the muscle biopsy test for malignant hyperthermia was negative, Dr. Ringer still suggested that condition may have caused Jessica's death. *Id.* at 67-68.

{¶ 20} The pathologist, Dr. Daniel Beckman, who performed the limited autopsy of Jessica also testified by way of deposition. (Beckman Dep. at 1, filed as Siegel Hearing Ex. 16.) Dr. Beckman testified that most of the time he does complete autopsies but that the autopsy form for Jessica was limited, and Dr. Ringer orally instructed him not to autopsy the brain. *Id.* at 35-44. He stated that Dr. Ringer's justification for the limitation was that intracranial pressure in the patient had been normal. *Id.* at 42-44. Dr. Beckman admitted that limited autopsies greatly increase the risk of incomplete or inaccurate results and stated that nervous system analysis is an "absolute necessity" in known neurosurgical cases. *Id.* at 51-52, 113. Consequently, he explained that he would have examined the brain to determine the cause of death but that he did not feel it was his prerogative to second-guess Dr. Ringer's limitation instruction. *Id.* at 42-45, 55-56. Consistent with this testimony, Dr. Beckman said he could not tell the cause of Jessica's death to a reasonable medical

certainty because he did not examine the brain. *Id.* at 58-59. He also noted that the brain is a gelatinous organ and opined that if Jessica were to have been exhumed at the time of his deposition in January 2009, the brain would have been decomposed and not amenable to examination. *Id.* at 55, 59-60. He completed his testimony by confirming that the autopsy report was completed on December 8, 2006. *Id.* at 116.

{¶ 21} In 2009, the Siegels filed an action in Hamilton County against (among other parties) Dr. Ringer; in response, Dr. Ringer claimed immunity. (Dec. 16, 2009 Compl. at ¶ 79.) Because Dr. Ringer claimed immunity to suit in the Hamilton County case, the Siegels also filed an action on December 16, 2009 against Dr. Ringer (among other defendants) in the Court of Claims of Ohio to determine the immunity action and, if necessary, pursue claims against the State employer pursuant to R.C. 2743.02(A)(2). (Dec. 16, 2009 Compl.) After a motion to dismiss on statute of limitations grounds was rendered moot by two amendments to the complaint, the defendant-appellee, University of Cincinnati College of Medicine (as the State agency through which Ringer claimed employment-related immunity) answered. (June 9, 2010 Answer.)

{¶ 22} On May 15, 2013, the Court of Claims held a hearing on the question of immunity at which much of the evidence discussed above (with the exception of the coroner's affidavit) was presented. (Hearing Tr. in passim.) Six months later, a magistrate of the Court of Claims decided that Dr. Ringer should be entitled to immunity by virtue of his employment as a professor and teacher of residents for the University of Cincinnati College of Medicine and the failure of the Siegels to prove that his actions were not manifestly outside the scope of his employment or done with malicious purpose, in bad faith, or in a wanton or reckless manner. (Nov. 5, 2013 Mag. Decision in passim.) The Court of Claims overruled objections and agreed with the magistrate's opinion that Dr. Ringer was a State employee and that the Siegels had " 'failed to prove that Dr. Ringer acted with malicious purpose, in bad faith, or in a wanton or reckless manner with regard to his treatment and care of Jessica Siegel.' " (Mar. 12, 2014 Decision at 2, quoting Nov. 5, 2013 Mag. Decision at 9.)

{¶ 23} This Court affirmed the finding that Dr. Ringer, as a State employee, was entitled to immunity, because some competent credible evidence supported that view. *Siegel v. State*, 10th Dist. No. 14AP-279, 2015-Ohio-441, ¶ 48-52. We subsequently clarified

(on a motion for reconsideration) the narrow nature of our holding and the holding below stating, "[t]he Court of Claims determined only that he was immune from suit"; "the Court of Claims did not adjudicate fraud, spoliation, or any of appellants' substantive liability claims against Dr. Ringer." *Siegel v. State*, 10th Dist. No. 14AP-279, ¶ 4 (June 30, 2015) (memorandum decision), citing *Siegel*, 2015-Ohio-441, at ¶ 14.  Despite the narrowness of this holding, the First District Court of Appeals affirmed a decision of the Hamilton County Court of Common Pleas that used our decisions to collaterally estop the Siegels from arguing that Dr. Ringer's hospital and practice group (Good Samaritan Hospital and Mayfield Clinic and Spine Institute, respectively) had committed fraud and spoliation of evidence.  *Siegel v. Ringer*, 1st Dist. No. C-160659, 2017-Ohio-6969, ¶ 27-33.

{¶ 24}  In light of the decision on collateral estoppel from the Hamilton County Court of Common Pleas, on remand in the Court of Claims, the University of Cincinnati obtained leave to amend its answer to include collateral estoppel as a defense to the Siegels' claims. (Aug. 24, 2016 Mot. to Amend; December 12, 2016 First Am. Answer.)  It then moved for summary judgment. (Oct. 4, 2018 Mot. for Summ. Jgmt.)  It argued that claims against Dr. Ringer for spoliation or fraud had already been adjudicated and that medical malpractice and wrongful death claims were time-barred.  *Id.* in passim.  The Siegels responded in opposition, pointing out that our prior decisions stated that the substantive liability claims against Dr. Ringer had not been adjudicated and arguing that their causes of action only accrued when they became aware (at the deposition of Nurse Smith in December 2008) that Dr. Ringer had altered the autopsy form.  (Oct. 17, 2018 Memo. in Opp.)  The Court of Claims concluded that all of the Siegels' claims were time-barred and granted summary judgment against them.  (May 1, 2019 Decision at 8, 12.)

{¶ 25}  The Siegels now appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 26}  The Siegels present 11 assignments of error for review:

> [1.]  The trial court erred to the prejudice of appellants in granting summary judgment when there are facts in dispute.
>
> [2.]  The trial court erred to the prejudice of appellants by failing to apply "discovery" to the facts of this case as to plaintiffs' claims for fraud and "any remaining claims."

[3.] The trial court erred to the prejudice of appellants in ruling that "discovery" does not apply to wrongful death actions.

[4.] The trial court erred to the prejudice of appellants in failing to apply "discovery" to R.C. 2743.16(A).

[5.] The trial court erred to the prejudice of appellants in concluding there was no contract between plaintiffs and defendants when signing the autopsy consent form.

[6.] The trial court erred to the prejudice of appellants by finding that "lack of informed consent, falsification of medical records, intentional alteration of medical records, and 'failing to report a death to the coroner,' are all 'medical claims."

[7.] The trial court erred to the prejudice of appellants by utilizing the "immunity" finding as a basis for granting summary judgment.

[8.] The trial court erred to the prejudice of appellants by using Civil Rule 56 to deny plaintiffs their Constitutional rights of "trial by jury" and "due process."

[9.] Ohio's statutory scheme in R.C. 2701.03 and 2743.041 are unconstitutional and deny due process and equal protection of the law to Ohio litigants and in this case these plaintiffs.

[10.] The trial court erred to the prejudice of plaintiffs-appellants in applying the Ohio Court of Claims Act and [*Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208] to create an unconstitutional denial of Due Process and Equal Protection of the laws.

[11.] The trial court erred to the prejudice of appellants by apply[sic] sovereign immunity to plaintiffs['] case.

For organizational clarity, we address the assignments of error relating to the application of various statutes of limitations by claim rather than by assignment number.

## III.  SUMMARY JUDGMENT STANDARD

{¶ 27} Civ.R. 56(C) provides that:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Supreme Court of Ohio has explained:

> Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 Ohio Op. 3d 466, 364 N.E.2d 267. The burden of showing that no genuine issue of material fact exists falls upon the party who files for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 1996 Ohio 107, 662 N.E.2d 264.

*Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 10; *see also, e.g., Esber Beverage Co. v. Labatt United States Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, ¶ 9.

{¶ 28} The Supreme Court has also discussed in detail the relative burdens of movant and nonmovant:

> [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  In deciding summary judgment, the trial court must give the nonmoving party "the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts."  *Byrd* at ¶ 25.  When reviewing a trial court's decision on summary judgment, our review is de novo and we

therefore apply the same standards as the trial court. *Bonacorsi v. Wheeling & Lake Erie Ry.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.

## IV.  DISCUSSION

### A. First Through Seventh Assignments of Error - Statute of Limitations Analysis by Claim

{¶ 29} The operative complaint in this case is somewhat organizationally difficult and does not separately delineate the legal and factual basis for each of the claims implicated by the general narration of allegations. (May 28, 2010 Second Am. Compl. in passim.) However, the Court of Claims found, and we agree, that the complaint appears to factually allege medical malpractice, wrongful death, breach of (or interference with) contract, fraud, and spoliation of evidence.[8] *Id.* at ¶ 67-69 (contract); *id.* at ¶ 69-71, 76 (spoliation); *id.* at ¶ 71-74, 76, 78-79 (fraud); *id.* at ¶ 75-77 (wrongful death); *id.* at ¶ 74-77, 85-88 (medical malpractice); *see also* May 1, 2019 Decision at 4-5, 8-9. Although Dr. Ringer was previously found to have immunity as an employee of an agency of the State of Ohio, the claims could proceed directly against the employer. R.C. 2743.02(A)(2); *see also* R.C. 9.86; R.C. 109.36(A)(1)(a); *Siegel*, 2015-Ohio-441. We therefore now address whether, construing the evidence and drawing all favorable inferences for the Siegels, each of these claims against Dr. Ringer's State employer, the University of Cincinnati, was time-barred.

{¶ 30} Preliminary to discussing the specifics of each claim we note that all claims in the Court of Claims are subject to the limitations period set forth in R.C. 2743.16, which provides, in relevant part:

> [C]ivil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of accrual of the cause of action or within any shorter period that is applicable to similar suits between private parties.

R.C. 2743.16(A). In short, the longest limitations period that will apply in this case is two years, though some claims have shorter periods.

---

[8] We also note that the complaint appears to have alleged battery and conversion of Jessica's body against the University of Cincinnati. (May 28, 2010 Second Am. Compl. at ¶ 112-13.) Although such claims were not specifically addressed in litigating summary judgment, the Court of Claims' summary judgment order contained a section resolving "Fraud and Any Remaining Claims" and the battery and conversion claims have not been addressed in the briefs. (May 1, 2019 Decision at 8.) Accordingly, we conclude that those claims have been abandoned and address them no further.

### 1. Medical Malpractice

{¶ 31} Generally, claims for medical malpractice "shall be commenced within one year after the cause of action accrued." R.C. 2305.113(A). "[A] cause of action for medical malpractice accrues and the one-year statute of limitations commences to run (a) when the patient discovers or, in the exercise of reasonable care and diligence should have discovered, the resulting injury, or (b) when the physician-patient relationship for that condition terminates, whichever occurs later." *Frysinger v. Leech*, 32 Ohio St.3d 38 (1987), paragraph one of the syllabus. Consistent with the general discovery rule, " '[w]hen an injury does not manifest itself immediately, the cause of action does not arise until the plaintiff knows or, by the exercise of reasonable diligence should have known, that he had been injured by the conduct of defendant.' " *Browning v. Burt*, 66 Ohio St.3d 544, 558-59 (1993), quoting *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84 (1983), paragraph two of the syllabus; *but cf.* R.C. 2305.113(C) and (D). In other words, there must be a " 'cognizable event' 'which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies.' " *Browning* at 559, quoting *Allenius v. Thomas*, 42 Ohio St.3d 131 (1989), syllabus.

{¶ 32} In this case, Jessica, who was then asymptomatic, went into the hospital for an embolization procedure to treat her AVM. *See supra* at ¶ 3-5. She had to be admitted to the hospital immediately following that procedure. *See supra* at ¶ 5. Her intracranial pressure was uncontrolled for several days post-operation to the extent that she had to undergo a hemicraniectomy to the right side of her skull and, just a few days after that operation, without ever regaining consciousness, she died. *See supra* at ¶ 6-11. In addition, the operation report from the embolization, signed by Dr. Ringer on August 23, 2006, shows that a number of parts of the procedure went at least somewhat awry. (Siegel Hearing Ex. 8 at 35-37.) Thus, even drawing all inferences in favor of the Siegels, it is clear that they would have believed or should have believed that Jessica's decline and death were related to the medical procedures performed by Dr. Ringer during August 2006. Yet, they did not file suit until 2009. The medical malpractice claims are time-barred in this case.

{¶ 33} The Siegels' first assignment of error is overruled in part.

### 2. Contract

{¶ 34} The Siegels' contract allegations are that their contract to have a complete autopsy performed was breached by Dr. Ringer or that Dr. Ringer interfered in that contract. (May 28, 2010 Second Am. Compl. at ¶ 67-68.) In Ohio, the statute of limitations for contract actions is either six or eight years depending on whether the contract in question is oral or written. R.C. 2305.06; R.C. 2305.07. However, their alleged damages, rather than traditional contract damages, sound in tort. (May 28, 2010 Second Am. Compl. at ¶ 69.) "The crucial consideration in determining the applicable statute of limitations in a given action is the actual nature or subject matter of the cause, rather than the form in which the complaint is styled or pleaded. A party cannot transform one cause of action into another through clever pleading or an alternate theory of law in order to avail itself of a more satisfactory statute of limitations." (Citations omitted.) *Callaway v. Nu-Cor Auto. Corp.*, 166 Ohio App.3d 56, 2006-Ohio-1343, ¶ 14 (10th Dist.). Thus, it could be argued that a lesser statute of limitations such as the two-year limitations set forth in R.C. 2305.10 should apply. Yet, we need not conclusively resolve the matter because the operation of R.C. 2743.16 limits the maximum limitations period to two years.

{¶ 35} "Ordinarily, a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed." *Collins v. Sotka*, 81 Ohio St.3d 506, 507 (1998). Yet, accrual may be delayed under the "discovery rule" if the would-be claimant was unaware of the potential claim. *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, ¶ 21-27. However, even under that rule, "the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action." *Id.* at ¶ 21, citing *O'Stricker*, 4 Ohio St.3d at 90.

{¶ 36} Assuming, arguendo, the autopsy consent and agreement that an autopsy would be performed constituted a contract and that such contract was breached or interfered with by Dr. Ringer, it would have been apparent to the Siegels that the contract had been breached or otherwise not fulfilled when the autopsy report showed that Jessica's head and brain had not been examined. (Autopsy Report at 1-2.) Although the Siegels did not view the autopsy report immediately after receiving it in December 2006, to exercise reasonable diligence would have been to read the autopsy report near the time it was received. Accordingly, although they did not, in fact, read the report until much later, it is

appropriate to consider that the cause of action accrued in December 2006 when the report was received. As they did not file suit until December 2009, the contract claims are time-barred.

{¶ 37} The Siegels' first, second, and fourth assignments of error are overruled in part. The Siegels' fifth assignment of error is rendered moot by our holding that the contract claims, even assuming a factual basis for them, are time-barred.

### 3. Wrongful Death

{¶ 38} The opinion of the Court on the claim for wrongful death reviewing the Siegels' third assignment of error and similarly relevant portions of the first and fourth assignments of error is set forth by Judge Beatty Blunt and joined by Judge Nelson beginning at paragraph 71 of this decision.

### 4. Spoliation

{¶ 39} Ohio recognizes an independent tort of intentional spoliation of evidence. *Elliott-Thomas v. Smith*, 154 Ohio St.3d 11, 2018-Ohio-1783, ¶ 10. "[T]he tort has five elements: '(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts.' " *Id.,* quoting *Smith v. Howard Johnson Co.*, 67 Ohio St.3d 28, 29 (1993). Caselaw containing discussion of the statute of limitations as applied to the particular tort of spoliation is nonexistent, but the language of R.C. 2305.09(D) suggests that a four-year statute of limitations would be appropriate. However, because this action proceeds in the Court of Claims, the four years is shortened to two by operation of R.C. 2743.16. As the Siegels did not bring suit until three years after Jessica's death, the question is whether the spoliation cause in this case accrued after her death.

{¶ 40} Drawing all reasonable inferences in favor of the Siegels, it would have been clear at the time of Jessica's death that the first two elements were satisfied—that is, that Dr. Ringer would have known that litigation by the Siegels was probable. As Nurse Smith put it:

Q. [] Why do you say you weren't surprised with the lawsuit?

A. A patient dies at the age of 16 unexpectedly, you assume something is going to happen.

(Smith Dep. at 83-84.)

{¶ 41} The evidence also supports a reasonable inference in favor of the Siegels that the other three elements were present. That is, that Dr. Ringer willfully acted to destroy evidence of the cause of Jessica's death in order to disrupt potential litigation with the result that such litigation has been disrupted almost completely. If the coroner's affidavit and his record keeper's affidavit are believed, Dr. Ringer's treatment team did not notify the coroner's office as they were arguably statutorily required to do,[9] thereby depriving a neutral government entity of the chance to find the truth about Jessica's death. (Hearing Tr. at 39, 80-82; Sammarco Aff. at ¶ 5-7; Hatten Aff. at ¶ 5-6.) Daniel Siegel testified that he specifically requested an autopsy of Jessica's brain to find out why she died and signed a form stating, "I (We) request and authorize the physicians and surgeons in attendance at the Good Samaritan Hospital to perform a complete autopsy on the remains of *Jessica Siegel*." (Siegel Hearing Ex. 5; Hearing Tr. at 109-10.) Both Dr. Ringer and Nurse Smith testified that, after Siegel signed the form authorizing a complete autopsy, Dr. Ringer ordered her to include a notation in the form limiting the autopsy to exclude Jessica's head. (Hearing Tr. at 53-54, 64-66, 113, 118-20; Smith Dep. at 45-48.) His justification for this was that he did not want to disfigure the body further and felt a brain autopsy would add nothing to the analysis of the cause of death. (Hearing Tr. at 55-56.) But, construing the evidence most strongly in favor of the Siegels, that explanation rings hollow. The pathologist who ultimately conducted the limited autopsy, Dr. Beckman, testified that limited autopsies greatly increase the risk of incomplete or inaccurate results and stated that nervous system analysis is an "absolute necessity" in known neurosurgical cases. (Beckman Dep. at 51-52, 113.) Consequently, he explained that he would have examined the brain to determine the cause of death but was instructed by Dr. Ringer, orally and in writing, not to autopsy the brain. *Id.* at 35-45, 55-56. He concluded that he could not specify the cause of Jessica's death to a reasonable medical certainty because he did not examine the brain and also opined that if Jessica were to have been exhumed at the time of

---

[9] R.C. 313.12(A) (requiring reporting to the coroner any death that is "unusual").

his deposition in January 2009, the brain would have been decomposed and not amenable to examination.  *Id.* at 58-60.

{¶ 42}  Despite the fact that the summary judgment record now permits an inference that the remaining three elements are satisfied, the evidence as to the third element of spoliation (willful destruction of evidence) did not come to light immediately and would not have, even with reasonable diligence on the part of the Siegels.  It is true that the Siegels delayed in reading the autopsy report and thus delayed their awareness that Jessica's brain had not been autopsied.[10]  (Hearing Tr. at 116, 155, 161-65; Autopsy Report at 1.)  But the autopsy report simply reported that "NO HEAD" had been examined and that there had been "no permission for removal of the brain."  (Autopsy Report at 1-2.)  Thus, although the autopsy report, if timely read, would have informed the Siegels that evidence had not been preserved, it could not have clarified whether the autopsy limitation constituted a simple accident or willful spoliation, and it would not have given the Siegels information as to who was responsible for the loss of the chance to find out why their daughter died.  Nor would reasonable diligence have availed the Siegels in their quest to find such answers because, when the Siegels became aware of the fact that Jessica's brain had not been examined and confronted Dr. Ringer with a query about why the autopsy had been limited, Dr. Ringer professed not to know.  (Hearing Tr. at 117-18, 160-61.)  This falsity went undetected until the Siegels took the deposition of Nurse Smith in connection with an unrelated case on December 17, 2008. (Smith Dep. at 1, 45-47.)  In short, the delay in filing was not attributable to the Siegels' failure to promptly read the autopsy but to Dr. Ringer's denial of knowledge about why the autopsy was limited.  Since the Siegels filed suit in this case on December 16, 2009, less than one year after learning that Dr. Ringer was the one who limited the autopsy, their claim for spoliation was timely filed.

{¶ 43} Regarding the sixth assignment of error, the University argues that the spoliation claim is a medical claim subject to the one-year statute of limitations. (University's Brief at 23-25.)  We disagree.  R.C. 2305.113 defines "medical claim" in relevant part as "any claim [including derivative claims for relief] that is asserted in any civil action against a physician * * * that arises out of the medical diagnosis, care, or

---

[10] Though not directly relevant to this analysis, it is worth noting that by the time the autopsy report was completed in December 2006, Jessica had already been dead for nearly four months and the evidence destruction was complete.  (Hearing Tr. at 114-16; Beckman Dep. at 116.)

treatment of any person."   R.C. 2305.113(E)(3)(a).   Drawing inferences in favor of the Siegels from the summary judgment record, Dr. Ringer's decision to limit the autopsy of Jessica Siegel after her father had already requested a full autopsy and signed an autopsy form authorizing a full autopsy, can be construed to have arisen from a desire to destroy the Siegels' ability to competently litigate the question of whether Dr. Ringer's attempted embolization procedure killed their 16-year-old daughter.   It is essentially a fraud claim, not a medical claim.

{¶ 44}  In relation to the seventh assignment of error, the University argues that the merits of the spoliation claim were already decided incident to the immunity decision. (University's Brief at 25-28.)  Yet, the University began the immunity hearing by clarifying that the hearing was "solely an immunity determination," and not to discuss or decide the merits. (Hearing Tr. at 12.)  Then many times during the immunity hearing, the University objected and the trial court sustained objections or limited questioning because the matters addressed would have departed from the narrow immunity issues.  (Hearing Tr. at 31, 98, 104-05, 230, 238-39, 249.)  Moreover, we expressly stated that neither our decision nor the Court of Claims' decision addressed the merits: "the Court of Claims did not adjudicate fraud, spoliation, or any of appellants' substantive liability claims against Dr. Ringer." *Siegel*, 10th Dist. No. 14AP-279, at ¶ 4 (memorandum decision), citing *Siegel*, 2015-Ohio-441, at ¶ 14.  And in fact, an examination of the Court of Claims decision leads to the conclusion that, even with respect to Dr. Ringer's " 'malicious purpose, [] bad faith, or [] wanton or reckless manner,' " the trial court merely found that the Siegels had " 'failed to prove' " such attributes in the limited hearing on the immunity determination.  (Mar. 12, 2014 Decision at 2, quoting Nov. 5, 2013 Mag. Decision at 9.)  The Court of Claims took no position (nor could it have) on what the Siegels could establish in summary judgment or by full trial on the merits with the live testimony of all pertinent witnesses.

{¶ 45}  The Siegels' first, second, fourth, sixth, and seventh assignments of error are sustained in part.

### 5.  Fraud

{¶ 46}  The elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading

another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55 (1987). The statute of limitations for such frauds is four years in general. R.C. 2305.09(D). However, that is shortened to two years by operation of R.C. 2743.16.

{¶ 47} Construing the evidence most strongly in favor of the Siegels, it is simple to see how a cause of action in this case exists for fraud. For example: (1) Dr. Ringer represented that a complete autopsy would be performed (Hearing Tr. at 110.); (2) That representation was material to the Siegels' desire to find out how their daughter died and their decision to exercise (or not exercise) their right to pursue legal action against Dr. Ringer; (3) That representation was false and Dr. Ringer would have known that it was, given that it was he who later ordered the autopsy to be limited (*Id.* at 53-54, 64-66, 110; Smith Dep. at 45-47.); (4) It is reasonable to assume that, by acquiescing to Daniel Siegel's request for a brain autopsy and having him sign a form with printed permission for a "complete autopsy," Dr. Ringer would have understood the Siegels to be relying on the representation that a complete autopsy would be performed (Hearing Tr. at 110; Siegel Hearing Ex. 5.); (5) The Siegels did justifiably rely on the statement by Dr. Ringer and did not take other action to secure an independent examination of Jessica's brain; (6) Jessica's brain was never examined, has now decomposed, and the Siegels will consequently find it difficult or impossible to determine how she died or assign fault for her death (Beckman Dep. at 58-60.).

{¶ 48} Nor are the inferences discussed above the only possible fraud claim that could be supported by the summary judgment record. There is also this: (1) Dr. Ringer represented that he did not know why the autopsy had excluded examination of Jessica's brain (Hearing Tr. at 117-18.); (2) That representation was material to the Siegels' decision to exercise (or not exercise) their right to pursue legal action against Dr. Ringer; (3) That representation was false and Dr. Ringer would have known that it was because it was he who had ordered the autopsy to be limited (both in writing and orally) ( *Id.* at 53-54, 64-66; Smith Dep. at 45-47.); (4) Given that the representation delayed suit against him (until statute of limitations deadlines came into play) and delayed discovery of the fact that he had acted to limit the autopsy and destroy evidence that possibly would have subjected him

to liability, a reasonable inference is that Dr. Ringer intended the Siegels to rely on his statement;  (5) The Siegels did justifiably rely on a statement by Dr. Ringer;  (6) And this was with the result that their pursuit of legal action was delayed such that hearing of the merits of their case has now been repeatedly delayed and obstructed.

{¶ 49}  Taking the view of the evidence most favorable to the Siegels, the inferential fact that these representations by Dr. Ringer were fraudulent (and not merely mistaken or negligent) from our review of the record would first have come to light during the deposition of Nurse Smith in December 2008.  (Smith Dep. at 45-47.)  That is, the Siegels had possession of the autopsy report prior to December 2008 and that report showed that Jessica's brain had not been examined.  *See* Autopsy Report at 1-2; Hearing Tr. at 114-16. But knowing that her brain had not been examined is not the same as knowing that someone (in this case the very doctor who operated on her brain) *prevented* it from being examined and then apparently lied about it.  (Hearing Tr. at 53-54, 64-66, 117-20, 160; Smith Dep. at 45-47; Beckman Dep. at 35-44.)   That is the knowledge which puts Dr. Ringer's course of conduct in a different light and allows a fraud-supporting set of inferences to be drawn.  But that knowledge was not available to the Siegels until they took the deposition of Nurse Smith on December 17, 2008.  (Smith Dep. at 1, 45-47.)  As the Siegels brought their claims for fraud on December 16, 2009, they are not time-barred.

{¶ 50}  As was true of spoliation, the University argues that the fraud claim is a medical claim subject to the one-year statute of limitations.  (University's Brief at 23-25.) We disagree for essentially the same reasons here as we did in regard to the spoliation claim.  *See supra* at ¶ 43.   Drawing all reasonable inferences in favor of the Siegels, Dr. Ringer's efforts to obfuscate the cause of death and delay the Siegels from litigation by denying his role in obfuscating the cause of Jessica's death are not claims arising out of the medical diagnosis, care, or treatment of Jessica.  R.C. 2305.113(E)(3)(a).

{¶ 51}  Similarly, the University argues that the merits of the fraud claim were already decided incident to the immunity decision. (University's Brief at 25-28.) The same response applies. *See supra* at ¶ 44. The University itself argued to limit the hearing to the issue of immunity and persistently objected in order to enforce that limitation.  (Hearing Tr. at 12, 31, 98, 104-05, 230, 238-39, 249.)  The hearing was limited and the merits were not finally decided either by the Court of Claims or on appeal.  *Siegel*, 10th Dist. No. 14AP-

279, at ¶ 4 (memorandum decision), citing *Siegel*, 2015-Ohio-441, at ¶ 14 (remarking "the Court of Claims did not adjudicate fraud, spoliation, or any of appellants' substantive liability claims against Dr. Ringer"; *see also* Mar. 12, 2014 Decision at 2, quoting Nov. 5, 2013 Mag. Decision at 9.). The fact that the Siegels failed to prove Dr. Ringer's "malicious purpose, [] bad faith, or [] wanton or reckless manner," in a limited hearing on the issue of immunity says little about what the Siegels could show in summary judgment or by full trial on the merits with the live testimony of all pertinent witnesses.

{¶ 52} The Siegels' first, second, fourth, sixth, and seventh assignments of error are sustained in part.

### 6. Summary

{¶ 53} The medical malpractice and contract causes of action are time-barred. According to the decision of the Court authored by Judge Beatty Blunt and joined by Judge Nelson (found at paragraph 71 et seq.), so is the wrongful death claim. The spoliation and fraud causes of action are not time-barred. All other causes of action are deemed abandoned. Thus, the Siegels' first, second, and fourth assignments of error are sustained in part and overruled in part. The Siegels' sixth and seventh assignments of error are sustained. Their third assignment of error is overruled and their fifth assignment of error is moot.

### B. Eighth Assignment of Error - Whether Civ.R. 56 Violates the Constitution by Denying the Right to a Jury Trial

{¶ 54} The Siegels argue that Civ.R. 56, governing the procedures related to summary judgment, is unconstitutional. (Siegels' Brief at 42-47.) We do not agree.

{¶ 55} In civil cases, the Seventh Amendment to the U.S. Constitution provides that "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any court of the United States, than according to the rules of the common law." The Ohio Constitution does not contain as much detail but states that the right to a jury trial is to be held "inviolate." Ohio Constitution, Article I, Section 5. However, in both the Ohio and federal systems, when there are "no genuine dispute[s] as to any material fact[s]," a court may engage in a process other than a trial to render a disposition in a case. Fed.R.Civ.P. 56(a); Civ.R. 56(C).

{¶ 56} As the United States Supreme Court has recognized in the context of Federal Rule of Civil Procedure 56, the rule only operates when "no genuine issue remains for trial"

and does not, therefore, in its proper exercise, "cut litigants off from their right of trial by jury if they really have issues to try." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944). Consequently, though the improper granting of summary judgment when there are triable disputes of material fact may violate a party's right to a trial, a "person's constitutional right to a jury trial is not abridged by the proper granting of a motion for summary judgment." *Penix v. Boyles*, 4th Dist. No. 02CA15, 2003-Ohio-2856, ¶ 38, citing *Houk v. Ross*, 34 Ohio St.2d 77, 83-84 (1973); *Tschantz v. Ferguson*, 97 Ohio App.3d 693, 714 (8th Dist.1994).

{¶ 57} Because we find that Civ.R. 56 does not violate the U.S. or Ohio Constitutions, the Siegels' eighth assignment of error is therefore overruled.

## C. Ninth Assignment of Error - Whether the Process to Disqualify Judges is Unconstitutional

{¶ 58} The Siegels, having unsuccessfully attempted to disqualify the Court of Claims' judge and magistrate, assert that the processes for attempting to disqualify a judge set forth in R.C. 2701.03 and 2743.041 are unconstitutional because they deny due process and equal protection to litigants. (Siegels' Brief at 48-49.) The Siegels observe that a judge against whom an affidavit of disqualification is submitted is not required to respond and that there is neither a hearing for, nor an appeal from, the resolution of the disqualification affidavit. *Id.*; *see also* R.C. 2701.03(E). Beyond these observations, the Siegels present no authority or reasoning for the proposition that R.C. 2701.03 and 2743.041 are unconstitutional. Our research revealed cases that have rejected such constitutional challenges. *Bland v. Graves*, 99 Ohio App.3d 123, 133-35 (9th Dist.1994); *State v. Frye*, 2d Dist. No. 96-CA-118, 1997 WL 762828, 1997 Ohio App. LEXIS 5489, *4 (Dec. 12, 1997). Accordingly, we do not find that either statute violates the Ohio or U.S. Constitutions and the ninth assignment of error is therefore overruled.

## D. Tenth Assignment of Error - Whether the Court of Claims, as a Court Consisting of Unelected Judge(s) in which there is no Right to a Jury Trial, Violates the Constitution

{¶ 59} We have previously recognized that, not having requested a jury in their complaint, the Siegels have waived any potential right to have had their claims submitted to a jury. *Siegel*, 2015-Ohio-441, at ¶ 19-20. Though we have discretion to consider their challenge on a plain error basis, we decline to do so. *Delta Fuels, Inc. v. Ohio Dept. of Transp.*, 10th Dist. No. 15AP-28, 2015-Ohio-5545, ¶ 27.

{¶ 60} We overrule the Siegels' tenth assignment of error.

### E. Eleventh Assignment of Error - Whether Sovereign Immunity Exists

{¶ 61} The Siegels claim that there is no such thing as sovereign immunity in the United States. (Siegels' Brief at 57-59.) Consequently, they argue that Dr. Ringer should not have been granted immunity and that they should not now be subject to the strictures of Ohio Revised Code, Chapter 2743. *Id.* We disagree.

{¶ 62} It has long been recognized as the law in Ohio and in the United States that sovereign immunity does exist and that a person cannot sue a state without the state's consent, as expressed through legislation. *See, e.g., Board of Edn. v. Volk,* 72 Ohio St. 469, 485-86 (1905). Perhaps the most fundamental challenge to sovereign immunity occurred when, shortly after the ratification of the U.S. Constitution, a South Carolinian attempted to sue the State of Georgia in federal court for remuneration in relation to goods supplied to Georgia during the American Revolution. *Chisholm v. Georgia,* 2 U.S. 419 (1793). In that case, the United States Supreme Court held that the states and citizens, as a consequence of being bound by the U.S. Constitution, had given up the states' sovereign immunity because the Constitution granted federal courts jurisdiction over controversies "between a State and citizens of another State." *Id.* at 452, 466, 469, 479; *but cf. id.* at 449; *see also* U.S. Constitution, Article III, Section 2, Clause 1. This was so great an upheaval to the status quo regarding the sovereign immunity status of states that not even quite two years after *Chisholm* issued, the states ratified the Eleventh Amendment to the U.S. Constitution, effectively overruling *Chisholm* and restoring their sovereign immunity. Sovereign immunity has persisted more or less intact ever since. *But see Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 663 (1978), and *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976) (permitting abrogation of the Eleventh Amendment to enforce the guarantees of other amendments).

{¶ 63} Furthermore, the Court of Claims, and on review, this Court, have already determined the immunity issue as regards to Dr. Ringer. *Siegel,* 2015-Ohio-441, in passim. We appreciate that it is a harsh result to require the Siegels to forego suing Dr. Ringer in common pleas court and instead sue a state entity in a court with no right to a jury, simply because Dr. Ringer was teaching residents for a state institution or had residents from a state institution observing during the procedures. *Theobald v. Univ. of Cincinnati,* 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 40-43 (Pfeifer, J., dissenting); *see also Ries v. Ohio State*

*Univ. Med. Ctr.*, 137 Ohio St.3d 151, 2013-Ohio-4545, ¶ 32-33 (O'Neil, J., dissenting). But that is the law in Ohio, and we are not empowered to change it. *Theobald* at ¶ 23-25; *see also Ries* at ¶ 14, 23-31. Since Ohio, through action of the legislature, has chosen to consent to be sued under the limited terms and in the place and manner set forth generally in Ohio Revised Code Chapter 2743, the Siegels are bound to sue the University (and thereby, Ohio) through that structure or not at all.

{¶ 64} We overrule the Siegels' eleventh assignment of error.

## V. CONCLUSION

{¶ 65} The medical malpractice, contract, and wrongful death claims against Dr. Ringer's employer under R.C. 2743.02(A)(2) are time-barred. The spoliation and fraud claims are not. All other claims are abandoned. Accordingly, the first, second, and fourth assignments of error are sustained in part and overruled in part. The third assignment of error relating to the wrongful death claim is overruled, and the fifth assignment of error is moot. The sixth and seventh assignments of error are sustained.

{¶ 66} Civ.R. 56 is not unconstitutional. Thus, the eighth assignment of error is overruled.

{¶ 67} The process by which a litigant may seek to disqualify a judge from hearing their case is not unconstitutional. The ninth assignment of error is overruled.

{¶ 68} Because the Siegels did not request a jury, we decline to address their argument that the lack of a right to a jury in the Court of Claims violates the Ohio or U.S. Constitutions. The tenth assignment of error is overruled.

{¶ 69} States have sovereign immunity in the United States unless they consent, through an act of the legislature, to be sued. The eleventh assignment of error is overruled.

{¶ 70} Therefore, the judgment of the Court of Claims of Ohio is reversed in part, affirmed in part, and remanded.

*Judgment reversed in part,*
*affirmed in part, and remanded.*

BEATTY BLUNT, J., concurs with the lead opinion, writes for the majority in part.
NELSON, J., concurs in judgment only as to the lead opinion and concurs with
partial majority opinion of BEATTY BLUNT, J.

BEATTY BLUNT, J., concurs with the lead opinion, writes for the majority as to the wrongful death claim, the third assignment of error, and those similarly relevant parts of the first and fourth assignments of error.

{¶ 71} The Siegels' claim for wrongful death is time-barred by the applicable statute of limitations as set forth in R.C. 2125.02(D)(1). Our counterparts in the First District Court of Appeals, who have already visited this very issue, were correct in finding that the Siegels were required to file any wrongful death action within two years of Jessica's death pursuant to R.C. 2125.02(D). *Siegel v. Ringer*, 1st Dist. No. C-160659, 2017-Ohio-6969, ¶ 19, 24.

{¶ 72} The Supreme Court of Ohio has held that "[t]he discovery rule applies to toll R.C. 2125.02(D), the two-year statute of limitations for a wrongful death claim." *Collins v. Sotka*, 81 Ohio St.3d 506 (1998), paragraph one of the syllabus, *overruling Shover v. Cordis Corp.*, 61 Ohio St.3d 213 (1991). The discovery rule is an exception to the general rule that "a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed." *Collins* at 507, citing *Kunz v. Buckeye Union Ins. Co.*, 1 Ohio St.3d 79 (1982). Under the discovery rule, "a cause of action accrues when the plaintiff discovers, or in the exercise of reasonable care should have discovered, that he or she was injured by the wrongful conduct of the defendant." *Id.*, citing *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84 (1983); *Oliver v. Kaiser Community Health Found.*, 5 Ohio St.3d 111 (1983), syllabus. "In essence, the running of the limitations period is delayed until triggered by a 'cognizable event' that alerts the plaintiff that he or she was injured by the defendant." *Id.* at 507-08, citing *Zimmie v. Calfee, Halter & Griswold*, 43 Ohio St.3d 54 (1989) (where the cognizable event in a legal malpractice case was the event that should have alerted a reasonable person that a questionable legal practice may have occurred).

{¶ 73} In *Collins*, it is clear the court was particularly concerned with the facts of that case, which included that the death was the result of a murder; that the body had not been found until almost five months after the murder (and hence the death) had occurred; and that although the cause of death became apparent when the time the body was found, the tortfeasor's identity was not known at that point. *See Collins* at 506, 510. To avoid the inequities which would result from a rigid application of the statute of limitations set forth in R.C. 2125.02(D), the high court went on to hold that "[i]n a wrongful death action that stems from a murder, the statute of limitations begins to run when the victim's survivors discover, or through the exercise of reasonable diligence should have discovered, that the

defendant has been convicted and sentenced for the murder." *Collins* at paragraph two of the syllabus.

{¶ 74} The wrongful death claim at issue in the case before us arises not from a murder, but from allegations of medical malpractice. The concerns present in the *Collins* case are simply not present in the instant matter. More specifically, the death of the decedent was apparent at the time it occurred and the identities of any potential tortfeasors—i.e., the medical professionals who rendered care to Jessica—were known at that time. Although the specific cause of death may not have been immediately apparent, this is so in many medical malpractice cases.

{¶ 75} Therefore, the discovery rule analysis applicable to medical malpractice actions as prescribed by the authority set forth in *Hershberger v. Akron City Hosp.*, 34 Ohio St.3d 1 (1987); *Allenius v. Thomas*, 42 Ohio St.3d 131 (1989); and *Flowers v. Walker*, 63 Ohio St.3d 546 (1992), controls. These cases establish that the commencement of the limitations period for medical malpractice actions turns on the occurrence of a cognizable event which does or should (1) inform the patient that his condition is related to medical treatment, and (2) put the patient on notice of the need to pursue possible remedies. *See Allenius* at syllabus. Such a cognizable event gives rise to the patient's duty to investigate potential bases for a malpractice action, and to identify the parties potentially responsible therefore. *See Flowers* at syllabus.

{¶ 76} In the case before us, the cognizable event for purposes of the discovery rule was decedent's death on August 23, 2006. Indeed, the Siegels' own actions show that they were on notice that further investigation into their daughter's death was warranted: they ordered a copy of the autopsy immediately after Jessica's death (Tr. at 115), and they hired an attorney in April 2007. *Siegel*, 2017-Ohio-6969, at ¶ 7. Thus, pursuant to R.C. 2125.02(D)(1), the Siegels' cause of action for wrongful death became time-barred on August 23, 2008. As the complaint in this case was not filed until December 16, 2009, the wrongful death claim is barred as a matter of law. Therefore, we overrule the third assignment of error and overrule in relevant part the first and fourth assignments of error as they relate to the wrongful death claim.

NELSON, J., concurs in judgment only as to the lead opinion and concurs with the partial majority opinion of BEATTY BLUNT, J.

BRUNNER, J., dissents as to the wrongful death claim, the third assignment of error, and those similarly relevant parts of the first and fourth assignments of error.

BRUNNER, J., dissenting as to the wrongful death claim, the third assignment of error, and those similarly relevant parts of the first and fourth assignments of error.

{¶ 77} I respectfully dissent from the conclusion of my colleagues as to the wrongful death claim as set forth in the third assignment of error and similarly relevant parts of the first and fourth assignments of error, as I believe the core of the wrongful death claim (the wrongful nature of Jessica's death) has not, to date, been discovered. Thus, the claim did not accrue prior to the filing of the action and still has not fully accrued.

{¶ 78} The statute of limitations for a wrongful death action is generally two years. R.C. 2125.02(D)(1). When accrual occurs in the context of wrongful death actions, it is best explained by a brief recapitulation of the history of the application of the discovery rule to such actions.

{¶ 79} In a 4-3 decision in 1991, the Supreme Court of Ohio found that the wrongful death statute of limitations was not subject to extension by the discovery rule because it was triggered by the event of death. *Shover v. Cordis Corp.*, 61 Ohio St.3d 213, 215 (1991). However, in 1998, the Court revisited and reversed this decision because, "[a] wrongful death claim is not triggered merely by the death of a person, but by 'the death of a person * * * *caused by wrongful act*.' " (Emphasis sic.) *Collins*, 81 Ohio St.3d at 509, quoting former R.C. 2125.01(A)(1). In *Collins*, the decedent had been murdered and the family was perfectly aware of when she had died and that it was caused by a wrongful act—what was missing, however, was the identity of the responsible party. *Id.* at 506-07. In holding that the limitations period did not begin to run until the responsible party was identified and convicted, the Supreme Court said:

> If Ohio's wrongful death statute remains in effect and is interpreted in the fashion that [*Shover* requires,] a tortfeasor need only kill his or her victim and fraudulently conceal the cause of death for two years to be absolved from civil liability.
>
> We are unwilling to further condone such a ludicrous result.

*Collins* at 510-11. In short, a would-be plaintiff in a wrongful death case has not discovered a possible cause of action until he or she has discovered or, through the exercise of

reasonable diligence, would have discovered, (1) a wrongful act[11] (2) by an identified entity that (3) caused the death.

{¶ 80} In Jessica Siegel's case, the operation report from the August 14, 2006 procedure shows that the embolizations were not successful and did result in some extravasation and other problems and thereby damaged Jessica to some extent. (Siegel Hearing Ex. 8 at 35-37.) That was enough to trigger the limitations clock in the context of medical malpractice (where all that is required is a "cognizable event which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies"). (Internal quotation marks omitted.) *Browning*, 66 Ohio St.3d at 559. However, wrongful death actions require that "the death of a person [be] caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued." R.C. 2125.01. In this case, neither the Siegels, nor anyone else, if the testimony of Dr. Beckman is to be believed, can offer evidentiary-quality testimony about why Jessica died or, therefore, who was responsible for that terrible event. *See supra* at ¶ 20. Thus, the wrongful death action did not accrue in 2006 and still has not accrued. Accordingly, it is not time-barred (though the fact that Jessica's brain was not analyzed may make it difficult to prove).

{¶ 81} I would, on this basis, sustain the Siegels' third assignment of error and also sustain in similarly relevant parts their first and fourth assignments of error. Because the portion of the majority decision joined by my colleagues does not, I respectfully dissent in part.

_____

[11] The shorthand "wrongful act" here should be understood to refer to the statutory requirement that the death of the person be "caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued." R.C. 2125.01.