**[Cite as *Siegel v. State*, 2026-Ohio-2157.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| Frances B. Siegel, Individually and as Administratrix of the Estate of Jessica A. Siegel et al., | : | |
| | : | |
| Plaintiffs-Appellants, | : | No. 25AP-388 (Ct. of Cl. No. 2009-09531JD) |
| v. | : | (REGULAR CALENDAR) |
| State of Ohio, d.b.a. University of Cincinnati College of Medicine et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on June 9, 2026

**On brief**: *John H. Metz*, for appellants. **Argued**: *John H. Metz*.

**On brief**: *Dave Yost*, Attorney General, and *Brian M. Kneafsey, Jr.*, for appellees. **Argued**: *Brian M. Kneafsey, Jr.*

APPEAL from the Court of Claims of Ohio

BEATTY BLUNT, J.

{¶ 1} Plaintiffs-appellants, Frances B. Siegel, individually and as administratrix of the estate of Jessica A. Siegel, and Daniel Siegel (collectively, "the Siegels"), appeal from the judgment of the Court of Claims of Ohio granting judgment in favor of defendants-appellees, State of Ohio, d.b.a. University of Cincinnati College of Medicine ("UC"), following a trial on the Siegel's claims of spoliation of evidence and fraud arising out of the death of their 16-year-old daughter, Jessica Siegel in August, 2006, and alleged efforts to conceal the cause of Jessica Siegel's death. For the following reasons, we affirm the judgment of the Court of Claims.

## I. Facts and Procedural History

{¶ 2} As observed by the Court of Claims in its decision, this is a complex medical case whose procedural history spans the course of over 15 years. The Court of Claims provided a thorough recitation of the factual and procedural background most relevant to the instant appeal[1] as follows:

> The facts in the present matter are tragic and involve the unfortunate death of Plaintiffs' daughter, Jessica Siegel. At nine years old, Jessica was diagnosed with arteriovenous malformation (AVM) after suffering a series of severe headaches and light sensitivity. (Trial Transcript, p. 60.) Jessica was initially treated at Cincinnati Children's Hospital by Dr. John Myseros and by the age of fifteen had successfully undergone three embolization operations and one radiosurgery with Dr. Myseros. *Id.* at p. 62. Moving his practice out-of-state, Dr. Myseros referred Jessica to Dr. Andrew Ringer for continued treatment. *Id.*
>
> Jessica first met with Dr. Ringer in March 2006 and a staged embolization operation was scheduled for July 2006 at Good Samaritan Hospital in Cincinnati, Ohio. (Plaintiffs' Exhibit 55.) In July 2006, Jessica underwent her first embolization surgery with Dr. Ringer. (Plaintiffs' Exhibit 4A.) During the embolization procedure, an AVM pedicle brand perforation occurred, but was asymptomatic and the procedure was otherwise successful. (Plaintiffs' Exhibit 15.) Dr. Ringer informed Plaintiffs that the first procedure was successful in resolving roughly 20 percent of the veins in question, but that another embolization procedure needed to be performed in four weeks. (Trial Transcript, p. 545.) The second embolization procedure was scheduled for August 14, 2006. *Id.*
>
> During the August 14, 2006 embolization procedure, two complications occurred. (Defendant's Exhibit A, p. 423-427.) First, a vein or artery was believed to have been perforated as there was an extravasation of contrast dye. *Id.* at p. 425. Second, there was a "filling defect" in the right middle cerebral artery, which appeared to have been caused by the glue entering an artery which was not intended for embolization.

---

[1] As the Court of Claims noted, in the magistrate's September 4, 2024 decision, she "laid out a meticulously detailed procedural and factual history," most of which is not directly relevant to the issues presented in the instant appeal. For the full summarization and history please refer to the Magistrate's September 4, 2024, decision. (*See* Apr. 25, 2025 Decision at 2, citing Mag.'s Decision at 1-44.)

*Id.*; *see also* (Defendant's Exhibit A, p. 423-427). Due to the increased potential of a blood clot occurring, Dr. Ringer administered a blood thinner and informed Plaintiffs that there had been complications during the procedure, but that everything was fine. (Trial Transcript, p. 548). While recovering that evening, Jessica suffered a sudden headache and stroke. *Id.* at p. 78. To prevent further harm, Jessica was placed in a medically induced coma. *Id.*

CT scans taken on August 15, 2006, showed a hematoma had developed and was increasing in size. *Id.* at p. 551. A catheter was placed in Jessica's skull to relieve the building pressure. *Id.* Plaintiffs were informed of the hematoma and of Jessica's condition. *Id.* at p. 78. Intercranial pressure continued to increase over the following days, and on August 18, 2006, Dr. Ringer performed a craniectomy. *Id.* at p. 81. On August 23, 2006, Dr. Bradley Bobbit performed a tracheostomy to provide continued airway support to Jessica. *Id.* at p. 199-200. Hours after the tracheostomy, Jessica's temperature spiked to 108 degrees Fahrenheit, and Jessica entered a code blue.[2] *Id.* at p. 78-82. Tragically, Jessica died on August 23, 2006. *Id.*

Plaintiffs filed lawsuits in 2008 and 2009 in the Hamilton County Court of Common Pleas related to Jessica's death and the unsanctioned harvesting of Jessica's eyes. *See Siegel, et al. v. LifeCenter Organ Donor Network, et al.*, Hamilton C.P. No. A0802827 (Mar. 20, 2008).

On December 16, 2009, Plaintiffs filed the present case in the Ohio Court of Claims (Court). This Court stayed the present case pending the connected action in Hamilton County Court of Common Pleas but allowed an evidentiary hearing to proceed to determine whether Dr. Ringer was entitled to civil immunity. (Entry, Dated Oct. 6, 2010.) In May 2013, the Court assigned Magistrate Holly Shaver to this case to conduct an evidentiary hearing on the civil immunity of Dr. Ringer. On May 15, 2013, the Magistrate conducted an evidentiary hearing to determine whether Dr. Ringer was entitled to civil immunity. The Magistrate recommended that Dr. Ringer was entitled to personal immunity pursuant to R.C. 9.86 and 2743.02(F), as he did not act in a willful, wanton, or reckless manner during

---

[2] "In Ohio, code blue is part of the hospital emergency code system and indicates that a patient has gone into cardiac or respiratory arrest." (Apr. 25, 2025 Decision at 3, citing Cleveland Clinic, *Code Blue Hospital*, https://my.clevelandclinic.org/health/articles/23532-code-blue-hospital (accessed Nov. 21, 2024).

his care and treatment of Jessica. (Magistrate Decision, Dated Nov. 5, 2013). Plaintiffs filed objections to the Magistrate's decision on November 18, 2013. This Court affirmed the Magistrate's decision and adopted it as its own. (Entry, Dated Mar. 12, 2014).

On April 3, 2014, Plaintiffs appealed this Court's decision. The Court's immunity determination was upheld by the Tenth District Court of Appeals, and the Supreme Court of Ohio declined to accept jurisdiction. *Siegel v. State*, 2015-Ohio-441 (10th Dist.); see also *Siegel v. State*, 2015-Ohio-5468, appeal not accepted. ("Upon consideration of the jurisdictional memoranda filed in this case, the court declines to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4)"). On March 9, 2016, the Ohio Supreme Court denied Plaintiffs' motion for reconsideration.

The proceedings in Hamilton County Court of Common Pleas held that Plaintiffs' claims were barred by the applicable statute of limitations and/or res judicata as Plaintiffs had failed to timely file their medical malpractice, wrongful death, and breach of contract claims. This decision was upheld by the First District Court of Appeals. Siegel v. Ringer, 2017-Ohio-6969, ¶ 27-33 (1st Dist.). With the connected action in Hamilton County Court of Common Pleas resolved, this Court's October 6, 2010 stay order was lifted and the case set for trial. (Order Vacating Stay of Proceedings, Dated July 3, 2018).

On October 4, 2018, Defendant filed a motion for summary judgment. On May 1, 2019, this Court granted summary judgment in Defendant's favor, finding that Plaintiffs' claims were barred by the applicable statute of limitations. On May 28, 2019, Plaintiffs appealed this Court's decision to the Tenth District Court of Appeals.

(Apr. 25, 2025 Decision at 2-5).

{¶ 3} In our previous plurality decision, *Siegel v. State of Ohio, d.b.a. Univ. of Cincinnati College of Medicine*, 2020-Ohio-4708 (10th Dist.) ("*Siegel I*"), this court affirmed the dismissal of the medical negligence, wrongful death, and breach of contract claims as being barred by the applicable statute of limitations as applied to claims brought in the Court of Claims. We further found, however, that based on the record as it existed

as of the filing of the motion for summary judgment, the spoliation of evidence and fraud claims were not so time-barred. Therefore, we reversed the Court of Claims' dismissal of these claims and remanded the case to the Court of Claims for further proceedings as to those two remaining claims.[3]

{¶ 4} Upon remand, UC and the Siegels each filed a motion for summary judgment on the remaining claims. The Court of Claims found that issues of material fact and credibility existed and denied both motions. (Sept. 28, 2023 Entry.)

{¶ 5} Beginning on November 6, 2023, the Court of Claims conducted a four-day trial before the magistrate on the remaining claims of fraud and spoliation of evidence. On September 4, 2024, the magistrate rendered her decision in which she found that the Siegels had failed to satisfy all necessary requirements for their claims of fraud and spoliation of evidence and that in any event both claims were barred by the statute of limitations. (Sept. 4, 2024 Mag.'s Decision at 76-92.)

{¶ 6} The Siegels timely filed objections to the magistrate's decision to which UC responded. On April 25, 2025, the Court of Claims issued its decision overruling the objections and adopting the magistrate's decision with minor modifications to reflect the analyses of the Court of Claims in its decision, rendering judgment in favor of appellees. (Apr. 25, 2025 Decision at 33.)

{¶ 7} On May 5, 2025, the Siegels filed a timely appeal which is now before this court.

## II. Assignments of Error

{¶ 8} The Siegels assert the following assignments of error for our review:

> [I.] The lower court erred in ignoring this court's Opinion and Order in this case of September 30, 2020, and in finding contrary to that Opinion and Order that the fraud and spoliation claims were time-barred.

---

[3] Upon the Siegels' appeal of our decision to the Supreme Court of Ohio, the court declined jurisdiction. *Siegel v. State*, 2021-Ohio-1399 (Apr. 27, 2021). A subsequent motion for reconsideration was denied. *Siegel v. State*, 2021-Ohio-2270 (July 6, 2021).

[II.] The lower court erred in ignoring this court's Opinion and Order in holding that the fraud and spoliation did not interfere with the claims of the family.

[III.] The trial court erred in holding that after reading the autopsy report "any reliance Plaintiffs may have had was thereafter unjustifiable."

[IV.] The trial court erred in holding Plaintiffs have no underlying claims to disrupt and Plaintiffs' claim for spoliation of evidence fails on the merits.

(Sic passim.)

## III. Discussion

### A. Standard of Review

{¶ 9} The trial court reviews a magistrate's decision de novo, as required by Civ.R. 53. *Skorvanek v. Ohio Dept. of Rehab & Corr.*, 2018-Ohio-3870, ¶ 24 (10th Dist.), citing *Mayle v. Ohio Dept. of Rehab. & Corr.*, 2010-Ohio-2774, ¶ 15 (10th Dist.). Further, in ruling on objections to a magistrate's decision, the trial court must undertake an independent review of the matters objected to in order "to ascertain [whether] the magistrate has properly determined the factual issues and appropriately applied the law." *Id.*, citing Civ.R. 53(D)(4)(d).

{¶ 10} "An appellate court, however, reviews a trial court's adoption of a magistrate's decision for an abuse of discretion." *Id.* at ¶ 25, citing *Mayle* at ¶ 15. Claims of trial court error must be based on the actions taken by the trial court itself, rather than on the magistrate's findings. *Mayle* at ¶ 15. A trial court abuses its discretion when it exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. The term abuse of discretion, " ' commonly employed to justify an interference by a higher court with the exercise of discretionary power by a lower court, implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.' " *Id.*, quoting *Black's Law Dictionary* 11 (2d Ed. 1910). Put another way, an abuse of discretion "implies that the

court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 11} Therefore, we may reverse the trial court's adoption of the magistrate's decision only if the trial court acted unreasonably, arbitrarily, or unconscionably, and " '[w]hen reviewing a trial court's disposition of objections to a magistrate's report, we will not reverse the trial court's decision if it is supported by some competent, credible evidence.' " *McNeilan v. The Ohio Univ. Med. Ctr.*, 2011-Ohio-678, ¶ 20 (10th Dist.), quoting *O'Connor v. O'Connor*, 2008-Ohio-2276, ¶ 16 (10th Dist.). Nevertheless, where an appeal from the trial court's action on a magistrate's decision presents questions of law, we review those questions de novo. *In re L.L.C.*, 2018-Ohio-4617, ¶ 15, citing *Brunetto v. Curtis*, 2011-Ohio-1610, ¶ 10 (10th Dist.).

### B. First Assignment of Error

{¶ 12} In their first assignment of error, the Siegels assert the Court of Claims erred by finding that their fraud and spoliation of evidence claims were time-barred, in direct contravention to our previous plurality decision issued in *Siegel I*, and that either the concept of collateral estoppel and/or the law-of-the-case doctrine apply to prevent such a finding. We do not agree.

{¶ 13} We begin by observing that our prior plurality decision was written based on the issues and facts present in the record at the summary judgment stage. The standards of review to be applied by the Court of Claims for summary judgment proceedings versus proceedings following a full trial with presentation of evidence are wholly different. The former requires all inferences to be construed in favor of the plaintiff; the latter both permits and requires the trier of fact to weigh the evidence and assess the credibility of witnesses.

{¶ 14} We acknowledge that in *Siegel I*, we stated at several points that the fraud and spoliation claims were not time-barred without also including a qualifier making it clear that we meant those claims were not time-barred based on the record as it existed at the summary judgment stage. For example, we stated, "[s]ince the Siegels filed suit in this case on December 16, 2009, less than one year after learning that Dr. Ringer was the one who limited the autopsy, their claim for spoliation was timely filed" (*Siegel I*, 2020-

Ohio-4708, ¶ 42); "[a]s the Siegels brought their claims for fraud on December 16, 2009, they are not time-barred" *id*. at ¶ 49; "[t]he spoliation and fraud causes of action are not time-barred." *Id*. at ¶ 53. Nevertheless, in the very first paragraph of the decision we stated, "***Construing the evidence most strongly in favor of the Siegels***, we find that ***the summary judgment record*** supports the inference that Jessica's doctor took steps to destroy evidence of the cause of death and subsequently misled the Siegels about having done so. Consequently, the causes of action for fraud and spoliation would have accrued only when the plaintiffs found out about the doctor's actions. We therefore find that the claims for spoliation and fraud were not time-barred ***on this record***[.]" (Emphasis added.) *Id*. at ¶ 1. This unequivocal statement makes clear that we did not find, as a matter of law, that these claims could not be found to be time-barred based on an expanded record after a full trial.

{¶ 15} Furthermore, despite the Siegels' insistence to the contrary, the concept of "collateral estoppel" is simply not applicable here. For collateral estoppel to apply, it must be shown by the party asserting the doctrine that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action. *Goodson v. McDonough Power Equip.*, 2 Ohio St.3d 193, 200-201 (1983). In this case, neither the fraud nor the spoliation of evidence claim was "fully litigated" and subsequently determined because again, our prior decision was concerned with a judgment rendered at the summary judgment stage. Thus, collateral estoppel cannot and does not apply.

{¶ 16} Likewise, the "law of the case" doctrine is simply not applicable here. As aptly stated by the Court of Claims, "the doctrine does not apply when subsequent proceedings involve different facts, legal issues, or different evidentiary standards." (Apr. 25, 2025 Decision at 10, citing *Stemen v. Shibley*, 11 Ohio App.3d 263, 266 (6th Dist. 1982) ("the doctrine of the law of the case does not foreclose a party from filing, nor a court from considering, a new motion for summary judgment based upon an expanded record, where a trial court had previously granted that party's motion for summary judgment which was subsequently reversed on appellate review."); *Johnson v. Morris*, 108 Ohio App.3d 343, 349 (4th Dist. 1995) (the doctrine of the law of the case did not apply to preclude the trial court from rendering summary judgment after it had previously

denied a motion to dismiss on the same legal issue because the two motions involve different evidentiary standards); *Stowell v. Ohio Fuel Gas Co.*, 13 Ohio Law Abs. 620, 625 (3rd Dist. 1933) (the law of the case did not apply in successive trials where the evidence was not identical); *see also Clymer v. Clymer*, 1995 Ohio App. LEXIS 4303, *9 (10th Dist. Sept. 26, 1995)).

{¶ 17} In *Siegel I*, we relied heavily on the evidence presented at the 2013 immunity hearing—and in particular the brief testimony of both Daniel and Frances Siegel. But as pointed out by the Court of Claims, by the time of the trial before the magistrate in 2023, that testimony had changed in several ways. (*See* Apr. 25, 2025 Decision at 11-13.) Specifically, in *Siegel I*, we quoted Daniel Siegel's testimony from the evidentiary hearing in 2013,

> that it took approximately until November or early December 2006 to obtain the autopsy report from the hospital. . . . It then was some time before [Daniel Siegel] could summon the will to read his daughter's autopsy. . . . After Siegel finally read the autopsy, he and his sister-in-law met with Dr. Ringer approximately one year after Jessica's death.

(Internal citations omitted.) *Siegel I*, 2020-Ohio-4708, at ¶ 14. We further noted that "Frances Siegel (Jessica's mother) testified briefly, confirming that . . . *they first read the autopsy report approximately one year after Jessica's death*." (Emphasis added.) *Id.* at ¶ 17. We also observed in our prior decision that "[a]lthough the Siegels did not view the autopsy report immediately after receiving it in December 2006, to exercise reasonable diligence would have been to read the autopsy report near the time it was received." *Id.* at ¶ 36.

{¶ 18} In contrast to the evidence before us at the time we issued our decision in *Siegel I*, the record now shows that at trial, the Siegels' testimony changed from their previous testimony in at least two meaningful respects. First, prior to the 2023 trial, the Siegels had consistently testified for over ten years that, despite having physical possession of Jessica's medical records and autopsy report in about December, 2006, they did not read those records and report until over a year later. Yet, at trial, Frances Siegel testified that she and Daniel Siegel *read the autopsy report in December 2006*, when they first received

it—a full year earlier than both had previously testified they had read it. (Emphasis added.) (Nov. 7, 2023 Tr. Vol. 2 at 589-590.). Indeed, Mrs. Siegel testified that the report was confusing to her because some things were incorrect (e.g., her daughter's height), and the report also included things she had not previously known (e.g., information regarding her daughter's eyes.) *Id.* She also testified at trial that she saw that the autopsy report stated "No Head" under restrictions. *Id.* at 591. Mrs. Siegel further testified they received the medical records and autopsy report at about the same time. *Id.* at 591-592. She also testified that it was soon thereafter that she and Mr. Siegel contacted attorney Paul Scott and sent the medical records and autopsy report to him. *Id.* at 592.

{¶ 19} Second, our prior decision in *Siegel I* relied on the Siegels' testimony that, "[a]fter [Daniel] Siegel finally read the autopsy, he and his sister-in-law met with Dr. Ringer *approximately one year after* Jessica's death." (Internal citations omitted.) (Emphasis added.) *Siegel I*, 2020-Ohio-4708, at ¶ 14. But the expanded record now shows that the timeline relied upon in our previous decision was not supported by the evidence at trial. Specifically, the record shows that the Siegels met with Dr. Ringer regarding Jessica's treatment at a significantly later date than they originally presented. (Nov. 6, 2023 Tr. Vol. 1 at 109-110). Thus, the law-of-the-case doctrine is inapplicable because the subsequent trial shows different facts than those relied upon previously.

{¶ 20} Additionally, as previously noted, our prior decision was written based on the issues and facts at the summary judgment stage. The standard of review for summary judgment proceedings and the standard of review following a full trial with presentation of evidence are completely different: the former requires all inferences to be construed in favor of the plaintiff; the other both permits and requires the trier of fact to weigh evidence and assess credibility of witnesses. Because the subsequent trial proceeding involved an evidentiary standard different from the evidentiary standard at the summary judgment stage, the law-of-the-case doctrine is inapplicable.

{¶ 21} In short, this court's prior plurality decision in *Siegel I* did not preclude the Court of Claims from revisiting the issue of whether the statute of limitations barred the Siegels' fraud and spoliation of evidence claims based on the evidence presented at trial and the application of the proper standard of review for weighing and assessing such

evidence. Nor did the Court of Claims err in ultimately concluding that the fraud and spoliation of evidence claims were barred by the applicable statutes of limitation based on the evidence presented at trial.

{¶ 22} Accordingly, based on the foregoing, the first assignment of error is overruled.

### C. Second, Third, and Fourth Assignments of Error

{¶ 23} In their second, third and fourth assignments of error, the Siegels assert, in essence, that the Court of Claims erred in its findings that even if the fraud and spoliation claims were not barred by the applicable statutes of limitations, the claims failed on their merits in any event. As explained below, because the issues raised under these three assignments of error are rendered moot by virtue of our finding under the first assignment of error, pursuant to App.R. 12(A)(1)(c), we decline to address them.

{¶ 24} App.R. 12(A)(1)(c) provides that "[u]nless an assignment of error is made moot by a ruling on another assignment of error," a court of appeals shall "decide each assignment of error and give reasons in writing for its decision." "An assignment of error is moot when it cannot have 'any practical legal effect upon a then-existing controversy.' " *State v. Gideon*, 2020-Ohio-6961, ¶ 26, quoting *Culver v. Warren*, 84 Ohio App. 373, 393 (7th Dist. 1948) (further citation omitted.) Put another way, " 'an assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court.' " *Eric Petroleum Corp. v. Vendel*, 2025-Ohio-1238, ¶ 40 (10th Dist.), quoting *Gideon*, 2020-Ohio-6961, at ¶ 26.

{¶ 25} Here, because the merits of the fraud and spoliation of evidence claims are the subject of the Siegels' second, third, and fourth assignments of error, and we have already found that the Court of Claims did not err in concluding the fraud and spoliation of evidence claims were barred by the applicable statutes of limitation based on the evidence presented at the full trial, any determination made by this court on the remaining assignments of error would not have any impact on a genuine, live controversy. In short, the merits (or lack thereof) of the fraud and spoliation claims are wholly irrelevant in light of the Court of Claims properly concluding that the claims are time-barred from being brought in the first instance.

{¶ 26} Accordingly, based on the foregoing, we find the second, third, and fourth assignments of error moot.

## IV. Disposition

{¶ 27} Having overruled the Siegels' first assignment of error and having found moot the Siegels' remaining assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

DORRIAN and MENTEL, JJ., concur.

_____